SAMSON v SAGINAW PROFESSIONAL BUILDING, INC

Docket No. 54852. Argued March 14, 1974 (Calendar No. 15).—Decided January 21, 1975.

Carol Samson, a secretary for an attorney who maintained offices in the Saginaw Professional Building, was robbed and stabbed in the elevator of that building by Donald Butzin, a patient of another tenant, a state mental clinic. Carol Samson and Wendell Samson brought an action for damages against the patient and against Saginaw Professional Building, Inc., on the theory that defendant corporation was negligent in renting its premises to a state mental clinic and not, thereafter, taking appropriate steps to protect its other tenants and patrons from foreseeable criminal actions committed by patients of the clinic. The jury returned a verdict of $60,492 for plaintiffs, and judgment was entered by Fred J. Borchard, J., in Saginaw Circuit Court. Defendant corporation appealed. The Court of Appeals, Danhof, P. J. (dissenting), and Bronson and T. M. Burns, JJ., affirmed. (Docket No. 11925.) Defendant appeals, arguing that it could not possibly protect all of its tenants all of the time, post guards in every hallway and on every elevator, and screen every person who entered the building, and that inaction on its part was appropriate. *Held:*

1. A landlord has a duty to tenants and invitees to protect them from unreasonable risk of physical harm in the common areas of the building that are not leased to individual tenants, and whether the actions of the defendant landlord in the

REFERENCES FOR POINTS IN HEADNOTES

[1] 57 Am Jur 2d, Negligence §§ 41, 63, 69.

[2–4] 57 Am Jur 2d, Negligence §§ 57–60, 66 *et seq.*

[2–5] Foreseeability as an element of negligence and proximate cause. 100 ALR2d 942.

[6] No reference.

[7] 49 Am Jur 2d, Landlord and Tenant §§ 805–808.

[8, 10–18] 49 Am Jur 2d, Landlord and Tenant § 283.
   Landlord's obligation to protect tenant against criminal activities of third persons. 43 ALR3d 331.

[9] 49 Am Jur 2d, Negligence §§ 780, 782–785.

instant case were reasonable or not in the performance of that duty is a question for the jury.

2. Admitting into evidence against defendant corporation the probate records of the codefendant, the patient, and the testimony of a former victim who had been stabbed by the patient was not error.

Levin, J., joined by M. S. Coleman and J. W. Fitzgerald, JJ., dissented on the ground that it is not claimed that the defendant was negligent in failing to repair some defect in the building which facilitated the attack, and that inquiries of the department of mental health about the propensities of patients of the clinic would have been fruitless; under these circumstances imposition of liability on the landlord militates against the public policy of returning mental patients to the community by discouraging rental of office space to state mental health clinics for outpatients, and by stigmatizing the mentally ill as persons who must be guarded against.

44 Mich 658; 205 NW2d 833 (1973) affirmed.

## Opinion of the Court

1. NEGLIGENCE—UNREASONABLE RISK OF HARM—CRIMINAL ACTS— THIRD PERSONS.

An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.

2. NEGLIGENCE—LIABILITY—RISK OF HARM—FORESEEABILITY—REASONABLE MAN.

The component parts of negligence which must be present before liability may exist are (1) the actor must realize or should .realize that there is a risk of harm—this is foreseeability; (2) the perceived risk must be unreasonable—failure to act as a reasonable man would.

3. NEGLIGENCE—FORESEEABILITY—REASONABLE MAN—DUTY.

Foreseeability depends upon whether or not a reasonable man could anticipate that a given event might occur under certain conditions, but the mere fact that an event may be foreseeable does not impose a duty upon the defendant to take some kind of action accordingly; the event which he perceives might occur must pose some sort of risk of injury to another person or his property, and some relationship must exist between the actor

and the other party which the law or society views as sufficiently strong to require more than the mere observation of events, before the actor may be required to act.

4. NEGLIGENCE—DUTY—UNREASONABLE RISK.

Negligence is not found to exist unless an actor who is under a duty to act fails to act after he has perceived or should have perceived an *unreasonable* risk of harm to another.

5. NEGLIGENCE—REASONABLENESS—FORESEEABILITY—JURY QUESTION.

Reasonableness and foreseeability are normally questions for the jury to determine in negligence actions.

6. LANDLORD AND TENANT—LEASES—MENTAL HEALTH—LIABILITY.

There is no liability and indeed should be none for the act, by itself, of leasing premises to a mental health clinic.

7. LANDLORD AND TENANT—COMMON AREAS—HALLS—LOBBY—STAIRS —ELEVATORS—INVITEES.

Common areas of a building such as the halls, lobby, stairs, elevators, etc., that are leased to no individual tenant remain the responsibility of the landlord; it is his responsibility to insure that these areas are kept in good repair and reasonably safe for the use of his tenants and invitees; and he has a duty to protect tenants and invitees from unreasonable risk of physical harm.

8. NEGLIGENCE—LANDLORD AND TENANT—FORESEEABILITY.

The fact that a secretary of a tenant in a professional building might be stabbed while riding in a building elevator by a patient of another tenant, a state mental health clinic, was foreseeable to the landlord where other tenants in the building had voiced their concern and uneasiness over the use of the elevators and stairwells by mental patients to the landlord, and the landlord had a duty to inquire further into the probability of such an event occurring.

9. NEGLIGENCE—LANDLORD AND TENANT—INVITEES—COMMON LAW.

The duty imposed upon a possessor of land to keep his property safe for his tenants and invitees also carries with it strong social considerations which have been firmly imbedded in our legal structure since the earliest days of common law.

10. NEGLIGENCE—LANDLORD AND TENANT—CRIMINAL ACTS—REASONABLE CARE—QUESTION OF FACT.

An ordinarily prudent landlord, as reasonable precaution against assaults on tenants of a building by mental patients who were

outpatients of a state mental health clinic in the building, might have rented to the state only office space on the first floor so that the patients would have no need to use the elevators, stairwells, or other common areas of the building, or might have placed a guard on the elevators to protect the people lawfully using them; it was the landlord's duty, not the tenants', to remedy a potentially dangerous situation, and whether the landlord used that degree of care which an ordinarily prudent person would have used created a question of fact for the jury.

### DISSENTING OPINION

LEVIN, M. S. COLEMAN, and J. W. FITZGERALD, JJ.

11. TORTS—DUTY—CRIMINAL ACTS.

*There is ordinarily no legal obligation to protect one stranger from criminal attack by another, but a special relationship between a defendant and the actor or defendant and the victim may expose the defendant to liability for a criminal attack, and knowledge, actual or constructive, by the defendant of some danger is usually a critical factor.*

12. LANDLORD AND TENANT—TORTS—CRIMINAL ACTS—DUTY—FAILURE TO REPAIR.

*A special relationship exists between a landlord and his tenant so that in some instances the landlord is liable for a criminal attack on a tenant by a third person, but in each such instance the landlord is guilty of independent negligence in that, despite prior knowledge of previous criminal acts either in the building or in the general area, he failed to repair a defect in the property which invited or facilitated the criminal attack.*

13. LANDLORD AND TENANT—CRIMINAL ACTS—DUTY—FAILURE TO REPAIR.

*A landlord, by virtue of his exclusive control, is in a unique position to remedy defects in common areas of the building, and it is therefore appropriate to impose on him liability for failure to discover and repair dangerous conditions giving rise to injury, including those that enable a third person to assault a tenant.*

14. LANDLORD AND TENANT—NEGLIGENCE—CRIMINAL ACTS—DUTY TO INQUIRE.

*Failure of a landlord to inquire about the types and dangerous propensities of mental patients on convalescent leave who were*

outpatients at a state mental clinic which was a tenant in the building was not negligence toward another tenant of the building who was assaulted by an outpatient, because, while the landlord might have learned that some of the patients had previously committed criminal acts, it would have been assured that patients on convalescent leave are not dangerous, since the state releases patients from institutions because they are no longer considered dangerous (MCLA 330.36).

15. LANDLORD AND TENANT—CRIMINAL ACTS—SECURITY MEASURES.

Liability may properly be imposed on a landlord for failing to provide security measures to protect tenants of a building from attack by outpatients at a state mental clinic in the building only if it could have taken a reasonable precaution which could reasonably have been expected to forestall such an attack.

16. LANDLORD AND TENANT—CRIMINAL ACTS—SECURITY MEASURES.

A memorandum by a landlord to all the office personnel of tenants of its building advising them to ride the elevators in pairs is not a "security measure" that it could reasonably be inferred would have prevented an attack on an employee of a tenant in the building by an outpatient of a state mental clinic which was also a tenant, where the evidence showed that other tenants had complained about the dress of visitors to the clinic and had expressed "apprehension" about them, but even this concern did not prompt the tenants to ride the elevators in pairs.

17. NEGLIGENCE—DUTY—PUBLIC POLICY.

Duty, one of the concepts which courts employ to confine the limits of negligence liability, is, in a particular case, a question of law for the court which inevitably turns on policy considerations: whether one owes a duty of protection to another is ultimately a question of fairness.

18. LANDLORD AND TENANT—CRIMINAL ACTS—DUTY—PUBLIC POLICY.

Imposition on a landlord of liability for a criminal attack on a tenant by an outpatient of a state mental clinic, another tenant, where the landlord can exercise no effective control over the outpatient except by excluding the clinic as a tenant or by providing an armed escort for each patient, might cause similarly-situated landlords to refuse to rent office space to the state for outpatient mental health clinics, might seriously impede the public policy of returning mental patients to the community, and would revitalize the stigma attached to mental illness that has after centuries only partially been eliminated.

*Cicinelli, Mossner, Majoros, Harrigan & Alexander,* for plaintiffs.

*Plunkett, Cooney, Rutt & Peacock* (by *Jeannette A. Paskin),* for defendant Saginaw Professional Building, Inc.

T. M. KAVANAGH, J. The Court of Appeals, 44 Mich App 658; 205 NW2d 833 (1973), upheld a jury verdict in favor of plaintiffs based on the defendant's alleged negligence in renting its premises to a state mental clinic and not, thereafter, taking appropriate steps to protect its other tenants and patrons from foreseeable criminal actions committed by patients-visitors to that clinic. We granted leave to appeal and now affirm.

*Facts:*

In December of 1964, the representatives of the Sagninaw Professional Building negotiated with Mr. George Eckes, the Director of the Mental Health Clinic in Saginaw, for location of that clinic within the building. Negotiations were completed and the clinic initiated occupancy in that building on the fourth floor from that date. The mental clinic was designated on the building directory as the "Saginaw Valley Consultation Center", as was the sign on the door. The clinic would see approximately 10 to 25 patients a day, and these included patients from Traverse City State Hospital and from Ionia State Prison.

Mrs. Samson was employed as a secretary to an attorney who maintained offices on the fifth floor of the Saginaw Professional Building. At approximately 10 a.m. on March 30, 1966, she left her office to go to the coffee shop located on the first floor. As she entered the elevator, Donald Butzin

(this defendant did not appeal to either the Court of Appeals or this Court) also got on. When the elevator started down, Butzin pushed the emergency stop button, produced a knife and demanded money. After taking her wallet, Butzin began stabbing her with a knife. He restarted the elevator, and when it reached the ground floor, ran away, and was later apprehended.

At the time of the attack, Butzin was a patient of the Saginaw Valley Consultation Center. In January of 1963, Butzin had previously attacked Mrs. Ann Weigold at her home, and slashed her with a knife. He was sent to the juvenile home, and then committed to the Traverse City Hospital on July 1, 1963, where he stayed for about a year. He then spent about two years at Ionia State Prison and returned for another year to the Traverse City Hospital. He was then placed on "convalescent leave" under the provisions of MCLA 330.36; MSA 14.826, but was not permanently discharged. He was to receive out-patient treatment with the Saginaw Valley Consultation Center approximately once a week. He was at the building on the day of the incident for such treatment.

*Issues:*

Appellant raises two issues here and in the Court of Appeals. They are:

1. Does a landlord and owner of a building who leases space to the State Mental Health Clinic owe any duty to an employee of a cotenant to protect such an employee from attack from a patient of the clinic?

2. Did the trial court err in admitting into evidence against the appellant the probate records of the codefendant, Donald Butzin, and the testi-

mony of the former stabbing victim of the co-
defendant Donald Butzin?

*TESTIMONY AND PROCEEDINGS:*

The trial court denied motions for summary
judgment, directed verdict, and judgment *n.o.v.*
The jury returned a verdict of $60,492 in favor of
the plaintiffs.

In affirming the trial court, the Court of Appeals
stated, *supra,* p 663:

"Defendant challenges the existence of its duty upon
such facts, claiming that it possessed no actual knowl-
edge that the patients on convalescent leave possessed a
propensity for violence, had no means available to
discover such knowledge, and had a right to rely upon
the decision by the Michigan State Department of
Public Health to place the patients on convalescent
leave status."

The Court of Appeals then stated that the build-
ing's owners did know that mental patients would
visit the Saginaw Consultation Center, and that
they had received some complaints from other
tenants regarding the poor dress of the mental
patients and they had also expressed their fear
and apprehension regarding the patients' use of
the stairs and elevators to reach the fourth floor
where the Center was located. The Court then
stated, pp 663–664:

"These concerns should have at least placed defend-
ant upon notice that a possible dangerous condition
may exist. The common knowledge available to defend-
ant's officers and agents that assaults and homicides are
committed by mental patients while on convalescent
leave would have provided similar notice."

The gist of the Court's holding was stated as (pp
664–665):

"The fact that the consultation center would be treating mental patients and the fact that those patients with a propensity to be violent present a risk created sufficient knowledge to require defendant to inquire further to determine the type of patients that would visit its building with regularity. After evaluating the competing considerations, we do not find that such inquiry created an undue burden upon defendant. The present record indicates that defendant absolutely failed to make such further inquiry and this failure may well be sufficient to support a finding of negligence. Had defendant conducted such inquiry, the risk would have become sufficiently foreseeable to reveal defendant's duty to adequately protect the employees of other tenants on the premises."

In his dissent, Judge DANHOF points out that even had the corporation made inquiries of the Consultation Center regarding the Center's patients, any information they might have received would be very limited. He points out that the mental records of these patients were highly privileged information under our state laws. He further states that (pp 673–674):

"the state was maintaining supervision over the patients and had the power to recommit them if they manifested antisocial propensities. Does not the public have the right to rely on the state to do its duty?

"As an additional ground I do not believe that it is fair to say that the defendant corporation placed Butzin in a position where he could injure others. Granting that the location of the clinic in the building made it more likely that the plaintiff would come in contact with a mental patient, I do not think that the doctrine should be carried to this extent. The possible ramifications of finding liability in this case are tremendous. It is not only state-operated clinics that attract individuals like defendant Butzin. Consider the case of a private psychiatrist, an attorney, or a bail bondsman. Is it the policy of this state to make landlords reluctant to rent to these people?

" * * * If the landlord is liable it seems to be an *a fortiori* proposition that the tenant would be liable. After all, the tenant is in a far better position to know of his patients', clients', or customers' propensities for viciousness. Is it the policy of this state to encourage psychiatrists to treat only those patients that he is absolutely sure are nonviolent? In this age of the greatly expanded right to counsel, is it the policy of this state to encourage attorneys not to represent criminal defendants?"

## Opinion of the Court:

As noted by the parties, this case essentially asks the Court to revisit its recent decision in *Johnston v Harris,* 387 Mich 569; 198 NW2d 409, (1972). In that case this Court stated, p 573, that §§ 302B, 448 and 449 of Restatement of Torts, 2d, set forth the general rules of law applicable to the situation wherein an injured tenant attempts to hold his landlord liable for assaults upon him by a third party upon the landlord's premises. § 302B of the Restatement provides:

"An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal."

The authors of the Restatement, 2d, have also furnished their comments on the applicability of this section to given fact situations, and the general concept of law which it was meant to express.

Comment d, p 89, states:

"Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence. In the ordinary case he may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone.

This is true particularly where the intentional conduct is a crime, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law. Even where there is a recognizable possibility of the intentional interference, the possibility may be so slight, or there may be so slight a risk of foreseeable harm to another as a result of the interference, that a reasonable man in the position of the actor would disregard it."

This essentially was the position taken by Judge DANHOF when he applied § 302B to the present case. However, the majority on the Court of Appeals preferred to base their opinion on Comment 3, pp 90–91 which states:

"There are, however, situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account. The following are examples of such situations. The list is not an exclusive one, and there may be other situations in which the actor is required to take precautions. * * *

"B. Where the actor stands in such a relation to the other that he is under a duty to protect him against such misconduct. Among such relations are those of carrier and passenger, innkeeper and guest, employer and employee, possessor of land and invitee, and bailee and bailor. * * *

"D. Where the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct."

However, the authors then comment that these are not the only factors to be applied in a given case. Comment f, p 93, states:

"It is not possible to state definite rules as to when the actor is required to take precautions against intentional or criminal misconduct. As in other cases of negligence (see §§ 291–293), it is a matter of balancing the magnitude of the risk against the utility of the actor's conduct. Factors to be considered are the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take. Where the risk is relatively slight in comparison with the utility of the actor's conduct, he may be under no obligation to protect the other against it."

Thus, many factors may be considered by the judge or jury in determining the ultimate question of whether or not a particular defendant was negligent. However, negligence itself has historically been spoken of in terms of its component parts which must be present before liability may exist. These have been embodied in § 302B. They are (1) the actor must realize or should realize that there is a risk of harm—this is foreseeability; (2) the perceived risk must be unreasonable—this is the basic element of all negligence; failure to act as a reasonable man would.

In the instant case other tenants of the defendant corporation had voiced their concern and uneasiness over the use of the elevators and stairwells of the building by these mental patients. At least to these tenants, the possibility of one of the

patients committing a criminal act was foreseeable. This was communicated to the defendant.

Defendant argues, however, that this is the first incident of its type that had ever occurred in the building. The director of the Saginaw Valley Consultation Center also testified that this was the first incident of this type that he was aware of in the history of the program and also in his nine years of practice in Michigan. Thus, defendant asserts the actions of Donald Butzin in this case were unforeseeable and liability based thereon is precluded. Defendant argues in its brief, p 10:

"[S]ince the Saginaw Professional Building did not have any knowledge of any dangerous tendencies of Donald Butzin or any of the other patients of the mental health clinic, the action by Donald Butzin was clearly unforeseeable and could not have been prevented by the Saginaw Professional Building."

Defendant's argument on the facts of the case, however, is directed basically towards the "reasonableness" of the risk involved, and not its foreseeability. 2 Harper & James, The Law of Torts, § 16.5, pp 907–908, quite aptly points out the flaw in defendant's argument. The authors state:

"Knowledge is fundamental to liability for negligence. The very concept of negligence presupposes that the actor either does foresee an unreasonable risk of injury, or could foresee it if he conducted himself as a reasonably prudent man. Foreseeability of harm, in turn, unless it is to depend on supernatural revelation, must depend on knowledge. Knowledge has been defined as the consciousness of the existence of a fact, and fact includes not only objects apparent to the senses but the characteristics and traits of people and animals and the properties and propensities of things—the laws of nature, human and otherwise."

Foreseeability, therefore, depends upon whether
or not a reasonable man could anticipate that a
given event might occur under certain conditions.
But the mere fact that an event may be foreseeable does not impose a duty upon the defendant to
take some kind of action accordingly. The event
which he perceives might occur must pose some
sort of risk of injury to another person or his
property before the actor may be required to act.
Also, to require the actor to act, some sort of
relationship must exist between the actor and the
other party which the law or society views as
sufficiently strong to require more than mere observation of the events which unfold on the part of
the defendant.[1] It is the fact of existence of this
relationship which the law usually refers to as a
duty on the part of the actor.[2]

Negligence, however, is not found to exist unless
an actor, who is under a duty to act, fails to act
after he has perceived or should have perceived an
*unreasonable* risk of harm to another. The fact
that no prior events had taken place within the
Saginaw Professional Building, and that the director had not been involved in instances of this
nature in nine years, plus the fact that the State
of Michigan had released these patients into the
community, all go to the question of whether or
not an unreasonable risk of harm was present
under the circumstances. No prior incidents would
possibly indicate a very low probability of an event
occurring in the future. The low probability, however, must be balanced against the magnitude of

---

[1] A distinction must be drawn between negligence based on actions
done by the actor, and negligence based on a failure of the actor to
perform some act when he was under a legal duty to do so. *See* 2
Restatement Torts, 2d, § 284. The present case involves negligence
based upon the failure of the actor to perform some act.

[2] As to the types of relationships which may impose a legal duty to
act upon the actor, *see* 2 Restatement Torts, 2d, §§ 314–324A.

the potential harm involved to determine whether or not inaction under these circumstances is reasonable. Also, reasonableness, as foreseeability, is normally a question for the jury to determine. General tort principles require this approach.

If the risk involves possible death or serious bodily injury to a number of persons, the law requires that some care be exercised even though the probability is slight that the incident will occur. Whether the care exercised was reasonable under the circumstances is for the jury to determine.

Defendant leased its premises to the Mental Health Clinic. For this act, by itself, our law imposes no liability and indeed should impose none. Whether or not the landlord retains any responsibility for actions which occur within the confines of the now leased premises is not now before this Court and need not be answered. It would appear, however, that he would not retain any responsibility for such actions except in the most unusual circumstances. However, the landlord has retained his responsibility for the common areas of the building which are not leased to his tenants. The common areas such as the halls, lobby, stairs, elevators, etc., are leased to no individual tenant and remain the responsibility of the landlord. It is his responsibility to insure that these areas are kept in good repair and reasonably safe for the use of his tenants and invitees.

The existence of this relationship between the defendant and its tenants and invitees placed a duty upon the landlord to protect them from unreasonable risk of physical harm. 2 Restatement Torts, 2d, § 314A (3).

The fact that such an event might occur in the future was foreseeable to this defendant. It had

even been brought to its attention by other tenants in the building. The magnitude of the risk, that of a criminally insane person running amok within an office building filled with tenants and invitees, was substantial to say the least. To hold that, possessed of these facts and no other, this defendant should have inquired further into the reasonableness of its inaction, *i.e.,* the probability of such an event occurring in the future, and that its failure to make such an inquiry may be deemed negligence on its part, does not shock the conscience of this Court.

Defendant's arguments that it could not possibly protect all of its tenants all of the time, post guards in every hallway and on every elevator, plus screen every person who entered the building are premature for they are based on the assumption that even if it had inquired further it would have gained no additional information. Therefore, it argues, inaction on its part was appropriate. Such an argument is as conjectural as is defendant's argument that it would have received no additional information. The record does not, and probably could not, contain testimony as to the answer to a question which was never asked. Defendant, however, was under a duty to ask such a question. It may not now conjecture on what the answer might have been and base its defense thereon.

In any event, the jury was instructed that the defendant could not have obtained the private records and history on Donald Butzin as defendant argued. The jury was, however, free to find that even with no additional knowledge as to the type of patients the mental health clinic treated, defendant was under a duty to provide some security measures or warnings for the safety of its tenants

and visitors even if it be nothing more than a memo to all the office personnel to ride the elevators in pairs. As noted before, the reasonableness of defendant's actions, with which its argument concerns itself, is a jury determination.

Nor are we unconcerned or unmindful of the social problems raised in this case by Judge DANHOF. However, we are also aware that the duty imposed upon a possessor of land to keep his property safe for his tenants and invitees also carries with it strong social considerations which have been firmly imbedded in our legal structure since the earliest days of common law. We do not feel that this Court should now reexamine a legal duty that has proven itself so well over the course of many years and continues to prove its validity even more in our modern society.

We prefer to recognize and uphold that duty in these types of relationships, leaving it to the jury to determine the ultimate questions which may impose liability, those of foreseeability, reasonableness and proximate cause. As in every case, we remain ready to review their factual findings to assure that they are supported by the record presented, as they are in the instant case. The jury in the instant case found the actions of this defendant unreasonable. We are unable to disagree on this record.

In light of the opinion above, and under the facts of this case, we believe the Court of Appeals' resolution of defendant's second issue was correct. Accordingly, the judgment of that Court is affirmed.

ADDENDUM (January 17, 1975)

Subsequent to the writing of the above opinion,

Justice LEVIN distributed his opinion. Justice LEVIN states:

"In traditional analysis, the plaintiff in a negligence action must establish (1) that he was legally protected against defendant's conduct (duty); (2) that defendant's conduct breached this duty (negligence); (3) that plaintiff's injury resulted from defendant's conduct (causal relation); and (4) the amount of loss suffered (damages)."

Justice LEVIN agrees that the existence of a special relationship between parties may impose a legal duty on one to protect the other from criminal attacks by a third person. He also says that such a special relationship exists between landlord and tenant.

He further states "[l]iability may properly be imposed on this landlord only if it could have taken a reasonable precaution which could reasonably have been expected to forestall such an attack". With this we agree. An ordinarily prudent person might have rented to the state only office space on the first floor so that mental patients would have no need to use the elevators, stairwells, or other common areas of the building. He might have placed a guard on the elevators to protect the people lawfully using them. It was his duty, not the tenant's, to remedy this potentially dangerous situation. Justice LEVIN himself states "[b]y virtue of his exclusive control, a landlord is in a unique position to remedy defects in common areas of the building. It is, therefore, appropriate to impose on the landlord liability for failure to discover and repair dangerous conditions giving rise to injury." Whether or not he used that degree of care which an ordinarily prudent person would have used created a question of fact for the

jury as to whether or not he breached his duty. The jury found that he did.

All my opinion says is that when the landlord is informed by his tenants that a possible dangerous condition exists in the building, he has a duty to investigate and take available preventive measures. Failure to do so, a jury could find, breaches his duty. The question was submitted to the jury under proper instructions. It found duty breached and damages. The judgment of the Court of Appeals is affirmed.

T. G. KAVANAGH, C. J., and SWAINSON and WILLIAMS, JJ., concurred with T. M. KAVANAGH, J.

LEVIN, J. The Michigan Department of Mental Health operates clinics providing outpatient care for released mental patients. One such clinic, the "Saginaw Valley Consultation Center", opened an office in the Saginaw Professional Building, owned and operated by defendant Saginaw Professional Building, Inc. The Consultation Center treated 10 to 25 patients a day. One of the patients was defendant Donald Butzin.

Carol Samson was a secretary working for a lawyer with an office on the fifth floor of the Saginaw Professional Building. The Consultation Center was on the fourth floor. While on an elevator in the building, Samson was robbed and stabbed several times by Butzin. She and her husband, Wendell Samson, sued Butzin and Saginaw Professional. The jury awarded damages of $60,000 to Carol Samson and medical expenses of $492 to Wendell Samson.

Butzin did not appeal. The Court of Appeals affirmed the verdict against Saginaw Professional based on its negligence in renting to a mental health clinic and in failing to protect the other

tenants against "foreseeable" criminal attacks by patients visiting the clinic.[1]

We would reverse.

## I

Butzin was 16 years old at the time of the assault. Three years earlier he had entered a woman's home, attempted to tie her up, and, when she tried to escape, slashed her with a knife. He was sent to a juvenile home, then released to his parents. A few months later, he was committed to the Traverse City State Hospital. After a year, he was placed on "convalescent leave",[2] released from the hospital, but not permanently discharged from the jurisdiction of the Department of Mental Health. For almost two years, from June, 1964 through March, 1966, Butzin visited the Consultation Center approximately once a week.

Neither Butzin nor any other patient had ever committed an assaultive act while visiting the Consultation Center. The Center moved to the Saginaw Professional Building in January, 1965, 15 months before the assault.

On the morning of the assault Samson left her office and entered the elevator, intending to go to a coffee shop on the first floor. Butzin came out of the men's room on the fifth floor and entered the elevator with her. When the elevator started down, he pushed the emergency stop button, pulled a knife and asked her for money. He seized her wallet and began stabbing her. After somehow cutting himself, Butzin restarted the elevator. When it reached the first floor, he ran away, but was later arrested in the building.

[1] 44 Mich App 658; 205 NW2d 833 (1973).

[2] MCLA 330.54; MSA 14.844.

II

The issue on appeal is the scope of tort liability of the owner of an office building for criminal acts committed by patients visiting a tenant.

Saginaw Professional contends that it had no "duty" to protect Samson, an employee of one tenant, from criminal attack by Butzin, a patient of another tenant. It concedes that an owner of property has a duty to exercise reasonable care to protect invitees from danger. However, it maintains that no duty arose here, as it neither knew nor should have known of the "danger".

The Samsons assert that it is common knowledge that dangerous persons visit mental health outpatient clinics and, therefore, Saginaw Professional's renting to the Department of Mental Health was a negligent act.

Alternatively, the Samsons contend that Saginaw Professional was negligent in failing at least to inquire about the patients that would visit the Consultation Center and warn the other tenants that persons formerly in mental institutions would be in the building.

III

We all agree that liability should not be imposed on the owner of an office building merely because it leased space to the state for operation of a mental health clinic.

Our disagreement concerns the scope of the landlord's duty to act affirmatively to protect its tenants from acts of patients visiting such a clinic.

Generally, a person is under no legal duty to protect another even if he knows, or should know,

that such action is necessary.[3] There is ordinarily no legal obligation to protect one stranger from criminal attack by another. See Anno: *Private Person's Duty and Liability for Failure to Protect Another Against Criminal Attack by Third Person,* 10 ALR3d 619, 626.

A special relationship may, however, expose one person to tort liability for the criminal attack of another person. That special relationship may exist between the defendant and the actor, or between the defendant and the victim. Knowledge, actual or constructive, by the defendant of some danger to be protected against is usually a critical factor.

Such a special relationship exists between a landlord and his tenant. Liability has been imposed on landlords for criminal attacks against tenants by third persons.[4] In no case, however, has the mere existence of the landlord-tenant relationship warranted recovery. In each instance, the landlord was guilty of independent negligence: despite prior knowledge (usually actual knowledge) of previous criminal acts in either the building or the general area, he failed to repair a defect in the property which invited or facilitated the criminal attack.

By virtue of his exclusive control, a landlord is in a unique position to remedy defects in common areas of the building. It is, therefore, appropriate to impose on the landlord liability for failure to discover and repair dangerous conditions giving rise to injury.

In *Johnston v Harris,* 387 Mich 569, 573; 198 NW2d 409 (1972), this Court held that a landlord

---

[3] 2 Restatement Torts, 2d, § 314, p 116.

[4] *See, e.g., Kline v 1500 Massachusetts Avenue Apartment Corp,* 141 US App DC 370; 439 F2d 477; 43 ALR3d 311 (1970), and other cases discussed in Anno: *Landlord's Obligation to Protect Tenant Against Criminal Activities of Third Persons,* 43 ALR3d 331.

was subject to liability in negligence for a criminal assault on a tenant entering the premises where, after being informed of similar assaults in the neighborhood, he failed to provide adequate lighting and locks in an area under his exclusive control and thus created "a condition conducive to criminal assaults".

The *Johnston* rationale followed closely the reasoning in *Kline v 1500 Massachusetts Avenue Apartment Corp,* 141 US App DC 370, 374; 439 F2d 477, 481; 43 ALR3d 311, 315 (1970). There the court said that the landlord, "the only party who has the *power* to make the necessary repairs or to provide the necessary protection" (emphasis by the Court), could be liable for injuries resulting from "foreseeable" criminal acts caused (at least in part) by failure to make necessary repairs as well as for injuries caused by the physical defects themselves.

In *Johnston* and *Kline,* the landlords had notice of a substantial crime problem. In each case the landlord's failure to remedy physical defects in the premises enabled a third person to assault a tenant.

In this case, no physical defect in the Saginaw Professional Building enabled Butzin to assault Samson. Butzin did not break into the building, but was rightfully there for an appointment at the Consultation Center. He could have been there to eat in the coffee shop, to visit a lawyer's office, to see an insurance agent, or simply to get in out of bad weather. Failure to keep premises in good repair was not a cause of Samson's injury.

## IV

The Samsons contend that Saginaw Professional was negligent in failing to inquire about the types

and dangerous propensities of the patients who would be visiting the Consultation Center.

Information regarding individual patients is confidential and would not have been revealed. At most, Saginaw Professional *might* have learned that some of the patients had previously committed criminal acts. It would have been assured, however, that patients on "convalescent leave" are not dangerous.[5]

The Samsons would require Saginaw Professional to second-guess the professional judgment of medical doctors employed by the state. The Samsons have not shown, and indeed common sense suggests otherwise, that the state, which releases patients from institutions because they are no longer considered dangerous, would have informed Saginaw Professional that the patients posed a threat to the public safety.

V

This Court imposes on the owner of a building who rents space to a mental health clinic a duty to provide "some security measures".

This suggests an archaic, unfounded fear of all persons who have been in mental institutions. Most persons afflicted with mental illness need not be confined indefinitely. With treatment, they can return to the community. Medical knowledge and human understanding have advanced beyond the time when the mentally ill were considered burdens to be cared for, but for whom cure was impossible. In requiring landlords to treat with suspicion persons who formerly suffered mental illness even after mental health officials have certified them ready to resume life in the community,

---

[5] MCLA 330.36; MSA 14.826.

this Court undermines this salutary and humanitarian advance and perpetuates the isolation of the mentally ill.

While we may take judicial notice of isolated incidents of violence committed by persons released from mental hospitals, we also note that persons without such a history commit violent acts and that countless former mental patients have successfully reentered society. In all treatment-release programs there have been and will continue to be failures.

There is understandable sympathy for Samson. She is the happenstance victim of a public policy which favors the release of mental patients who, in the judgment of the authorities, are ready to resume life in the community.

The cost of this policy may properly be imposed on all of society. Some states have enacted crime victim reparations acts.[6] The National Conference of Commissioners on Uniform State Laws last year approved, and the American Bar Association recently endorsed, a uniform act.[7] The Michigan Legislature may adopt such an act. But simply because it has not, we may not properly impose liability on this landlord because Butzin committed his senseless attack in its building instead of on the sidewalk across the street. Liability may

[6] *Crime Victim Compensation: The New York Solution,* 35 Albany L Rev 717 (1971).

Edelhertz, Chappell, Geis, and Sutton, *Part II—Public Compensation of Victims of Crime: A Survey of the New York Experience,* 9 Crim Law Bulletin 101 (1973).

Vitali, *A Year's Experience with the Massachusetts Compensation of Victims of Violent Crime Law, 1968 to 1969,* 4 Suffolk Un L Rev 237 (1970).

Geis and Edelhertz, *California's New Crime Victim Compensation Statute,* 11 San Diego L Rev 880 (1974).

*Symposium, Governmental Compensation for Victims of Violence* (articles by seven authors), 43 So Cal L Rev 1 (1970).

[7] 11 ULA 35.

properly be imposed on this landlord only if it could have taken a reasonable precaution which could reasonably have been expected to forestall such an attack. No such precaution has been suggested.

Our colleagues suggest that as a "security measure" Saginaw Professional should have written "a memo to all the office personnel to ride the elevators in pairs". Even assuming that the tenants had originally adhered to the memo's directives, it is most unlikely that after almost 15 months, with no criminal assaults, tenants would still be entering the elevators only in pairs.

The Samsons offered evidence that other tenants had complained about the dress of certain visitors and had expressed "apprehension" concerning them. If such concern did not prompt the tenants to ride the elevators in pairs, then clearly a memo from the owner would not have done so. A trier of fact could not reasonably infer that this "security measure" would have prevented Butzin's attack.

## VI

In traditional analysis, the plaintiff in a negligence action must establish (1) that he was legally protected against defendant's conduct (duty); (2) that defendant's conduct breached this duty (negligence); (3) that plaintiff's injury resulted from defendant's conduct (causal relation); and (4) the amount of loss suffered (damages).[8]

Duty is one of the concepts courts employ to confine the limits of negligence liability. The question of "duty" in a particular case is one of law for

[8] Green, *Foreseeability in Negligence Law,* 61 Colum L Rev 1401 (1961).

the court.[9] Inevitably, regardless of the court's analysis, the duty question turns on policy considerations: "whether one owes a duty of protection to another is ultimately a question of fairness".[10]

In *Elbert v Saginaw,* 363 Mich 463, 476; 109 NW2d 879 (1961), Justice TALBOT SMITH said:

"[T]he problem of duty is simply the problem of the degree to which one's uncontrolled and undisciplined activities will be curtailed by the courts in recognition of the needs of organized society. This determination those of the vicinage are not trained to make, however faultless their composite judgment may be as to which of their neighbors is lying and which is telling the truth. It involves, as we have. seen, much of legal history, of precedent, of allocations of risk and loss. Prosser puts it succinctly. In discussing the apportionment of responsibilities between judge and jury he states among the duties of the court 'the determination of any question of duty—that is, whether the defendant stands in such a relation to the plaintiff that the law will impose upon him any obligation of reasonable conduct for the benefit of the plaintiff. This issue is one of law, and is never for the jury'."

It is not enough, therefore, to say that Saginaw Professional owed Samson a duty to provide reasonably safe premises, that it was foreseeable that a mental patient visiting these premises might commit an act of violence and that it was, accordingly, for the jury to decide whether Saginaw Professional acted as a reasonable person would have acted under the same or similar circumstances.

While the above analysis is not inaccurate, it is incomplete. Negligence analysis limited to the

[9] Prosser, Torts (4th Ed), § 37.

[10] Note, *Landlord's Duty to Protect Tenants from Criminal Acts of Third Parties: The View from 1500 Massachusetts Avenue,* 59 Geo L J 1153, 1180 (1971).

question of foreseeability ignores the vital policy questions presented in this case.

"Everyone can foresee the commission of crime virtually anywhere and at any time. If foreseeability itself gave rise to a duty to provide 'police' protection for others, every residential curtilage, every shop, every store, every manufacturing plant would have to be patrolled by the private arms of the owner. And since hijacking and attack upon occupants of motor vehicles are also foreseeable, it would be the duty of every motorist to provide armed protection for his passengers and the property of others. Of course, none of this is at all palatable.

"The question is not simply whether a criminal event is foreseeable, but whether a *duty* exists to take measures to guard against it. Whether a *duty* exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." (Emphasis in the original.) *Goldberg v Housing Authority of Newark,* 38 NJ 578, 583; 186 A2d 291, 293; 10 ALR3d 595, 601 (1962).

The public policy of this state is to treat mental patients and, where possible, return them to the community. Before releasing a patient, careful consideration is given to his ability to cope with the responsibilities of "freedom" and the possible dangers he poses to himself and the community. The release decision necessarily reflects a judgment that the patient will not engage in violent behavior.

A landlord's liability for defective conditions in common areas is premised on his control of those areas. In this case, there was no defective condition. The only effective control Saginaw Professional could have exercised would have been either

to exclude the Consultation Center from the building or to provide armed guards to escort each patient from the sidewalk to the fourth floor, to and from the restrooms, and from the fourth floor back to the sidewalk.

Imposition of liability on Saginaw Professional may cause similarly-situated landlords to refuse to rent office space to the state for operation of out-patient mental health clinics and may impede the state's goal of returning mental patients to the community.

The implications for other landlords with possibly "troublesome" tenants are apparent. No line is discernible to distinguish the liability sought to be imposed on Saginaw Professional from potential liability of landlords who rent to psychiatrists or lawyers who see persons with violent or criminal backgrounds. Liability might also be imposed on a landlord who rents an apartment to a former mental patient. Need a landlord check the background of a tenant for evidence of mental problems or criminal history and then, if he discovers such evidence, either exclude him or circulate a memo that a former or present mental patient or person with a criminal history works or lives in the building?

Imposition of liability in this case assures that former mental patients will continue to be investigated, guarded against and treated with suspicion. This Court revitalizes a stigma that after centuries has, it appears, only partially been eliminated.

We would reverse and remand for entry of a directed verdict in favor of Saginaw Professional.

M. S. COLEMAN and J. W. FITZGERALD, JJ., concurred with LEVIN, J.