GRONCKI v DETROIT EDISON COMPANY

BOHNERT v DETROIT EDISON COMPANY

PARCHER v DETROIT EDISON COMPANY

Docket Nos. 101954, 102212, 102650, 103455. Argued October 9, 1996 (Calendar Nos. 11-13). Decided December 30, 1996.

Gerald and Cheryl Groncki brought an action in the Oakland Circuit Court against the Detroit Edison Company, alleging negligence on the part of Detroit Edison in maintaining certain overhead power lines that resulted in injuries to Gerald Groncki when a ladder he was moving came into contact with the lines. The court, Francis X. O'Brien, J., granted Edison's motion for summary disposition. The Court of Appeals, JANSEN, P.J., and M. J. TALBOT, J. (WHITE, J., concurring), reversed in an unpublished opinion per curiam, determining that the injuries were foreseeable (Docket No. 153538). The defendant appeals.

Barbara Bohnert, as executrix of the estate of Wendell Bohnert, deceased, brought a similar action in the Monroe Circuit Court against Detroit Edison, Carrington Homes, Inc., and others, arising out of the electrocution of Wendell Bohnert at a home construction site. The court, William F. LaVoz, J., granted summary disposition for the defendants. The Court of Appeals, MURPHY, P.J., and JANSEN and P. M. METER, JJ., affirmed in part, reversed in part, and remanded for further proceedings regarding the question of foreseeability in an unpublished opinion per curiam (Docket No. 158314). The defendants appeal.

Theodore R. Parcher, Jr., and Yvonne M. Parcher, for themselves and as next friend of Amanda Mae Parcher, a minor, also brought a similar action in the Lapeer Circuit Court, against Detroit Edison, arising out of the electrocution of Theodore Parcher at a construction site. The court, Martin E. Clements, J., granted summary disposition for Detroit Edison. The Court of Appeals, CONNOR, P.J., and WAHLS and SAAD, JJ., affirmed, finding the accident not foreseeable (Docket No. 161576). The plaintiffs appeal.

In separate opinions, the Supreme Court *held*:

Detroit Edison owed no duty to protect or warn the victims with respect to its power lines. In *Bohnert v Carrington*, remand is

required to determine whether the accident was foreseeable with respect to Carrington.

Chief Justice BRICKLEY stated that the scope of the duty owed by electrical companies to move, insulate, or de-energize overhead power lines is to protect against foreseeable harm. The test to determine whether a duty was owed is not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure. When the test is applied to these cases, no duty arose on the part of Edison to protect or warn the victims.

Public policy also mitigates against the imposition of a duty in these cases. The social policy at issue is the public's need for electric power at a reasonable cost. To impose a duty to relocate, insulate, or de-energize power lines whenever third parties construct buildings near power lines would interfere with this policy. To impose the duty the plaintiffs request would result in significant cost that would be passed on to consumers. Further, it may often be impossible for Edison and other power companies to move power lines away from new construction without moving them closer to preexisting structures.

The Court of Appeals correctly overturned the award of summary disposition for Carrington. The liability of Carrington is governed by *Funk v General Motors Corp*, 392 Mich 83 (1974), which held it to be a part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas that create a high degree of risk to a significant number of workers. For there to be liability under *Funk*, there must be a general contractor with supervisory and coordinating authority over the job site, a common work area shared by the employees of more than one subcontractor, and a readily observable and avoidable danger in that common work area that creates a high degree of risk to a significant number of workers. In deposition and before the circuit court, Carrington took the position that it was the general contractor. Considering these facts in the light most favorable to the nonmoving plaintiff, there is a genuine question of material fact with regard to whether Carrington was the general contractor and had supervisory and coordinating control over the workplace. Further, questions of fact exist regarding the presence of a common work area, whether employees of other subcontractors would be working in this area, whether there was the presence of a readily observable, avoidable risk to a

significant number of workers, and the number of employees exposed to such a risk. Because at this juncture there are material questions of fact with respect to each of the elements of *Funk*, summary disposition was not proper.

Justice BOYLE concurred only in the result.

Justice MALLETT, joined by Justice CAVANAGH, concurring in part and dissenting in part, stated that in *Groncki* Detroit Edison should be liable for the injuries incurred because it was foreseeable that the plaintiff would come into harmful contact with the overhead power lines. The grant of summary disposition in favor of the utility should be reversed, and the case remanded to the trial court for further fact finding with regard to the general negligence claim.

A negligence action may be maintained only if a legal duty exists that requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm. This inquiry is of critical importance where a company is involved in an inherently dangerous enterprise such as the delivery of electricity. The necessary relationship arises out of the nature of the activity. In addition is the requirement of foreseeability, i.e., whether the reasonable person not only could anticipate the likelihood that a particular event would occur, but that such an event would pose a risk of injury or harm to a person or property. The appropriate test is not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure.

In holding that the utility has no duty in *Groncki*, the lead opinion interprets too narrowly the holding in *Schultz v Consumers Power Co*, 443 Mich 445 (1993), placing far too much emphasis on the fact that, like the plaintiffs in *Bohnert* and *Parcher*, the plaintiff in *Groncki* was an experienced maintenance worker who knew about the dangers of power lines and had even warned other workers about them. In *Groncki*, as in *Schultz*, even though there was no allegation that the wire was in disrepair, and in spite of the plaintiff's alleged experience, it is still altogether possible that the plaintiff simply could not perform routine maintenance tasks without confronting an unreasonable risk of harm because of inadequate work space. Therefore, Edison breached its duty to reasonably inspect and install its lines.

Justice RILEY, concurring in part and dissenting in part, stated that Wendell Bohnert's death did not result, as a matter of law, from Carrington Homes' failure to take some particular action at

the worksite where the danger was not unreasonably high for an experienced delivery worker like Bohnert.

Justice WEAVER, joined by Justice RILEY, concurring in part and dissenting in part, stated that, as a matter of law, there was not a high degree of risk to Bohnert presented by the overhead electrical lines that would render defendant Carrington Homes, the general contractor, liable. Therefore, the decision of the Court of Appeals should be reversed and the trial court's grant of summary disposition for this general contractor, Carrington Homes, affirmed.

*Funk*, and its progeny *Plummer v Bechtel Construction*, 440 Mich 646 (1992), should not be followed. The lead opinion creates concepts which represent a significant departure from time-tested theories of tort liability. General contractors must now be prepared to assume responsibility for any injury received by the employee of a subcontractor, no matter how negligent the employee may be.

*Groncki* reversed.

*Parcher* affirmed.

*Bohnert* affirmed in part, reversed in part, and remanded.

Justice LEVIN, dissenting, stated that the test to determine whether a duty was owed is not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure. Applied to this case, Detroit Edison had a duty to exercise due care to protect against reasonably foreseeable contact by workers, skilled and unskilled, as well as homeowners, with uninsulated lines.

The lead opinion combines the separate questions of duty, negligence, and comparative negligence, and concludes prematurely on a woefully inadequate summary disposition record and incomplete factual assessment that Detroit Edison could not have been expected to do anything to protect the injured and deceased workmen who could have avoided injury had they been more alert and careful. *Koehler v Detroit Edison Co*, 383 Mich 224 (1970), although speaking in negligence terminology, was decided at a time when any contributory negligence of the injured person precluded recovery. Now, the injured person's comparative negligence reduces, but does not preclude, recovery. The lead opinion redefines duty to include in the calculus the fault of the particular injured person, a worker in this case, holding, in effect, that Detroit Edison has no duty to the comparatively negligent. This redefinition of duty is brought about by asking not whether injury to some person (worker—skilled or not—or nonworker) from unintentional contact with uninsulated electrical lines is foreseeable under ordinarily

foreseeable circumstances, but rather whether negligent contact with uninsulated lines by a skilled worker should have been foreseen. The lead opinion then conclusorily responds in the negative, ignoring that most injuries, including most workplace injuries, even of skilled workers, could be avoided if the injured person was at all times alert and careful and never made a mistake due to fatigue, momentary lapse, distractions, or otherwise.

Absent record evidence, the lead opinion finds that the potential cost to Detroit Edison to undertake temporary safety measures is so great that it relieves it of any duty to safeguard a skilled worker who knows of the risk and by mistake encounters uninsulated lines. No thought is given to other alternatives. It might persuasively appear from a more complete record and thorough analysis that a different result might be required. A different question would be presented if Detroit Edison were not aware of the new construction and had no time to take temporary measures in the areas where cranes and booms may encounter uninsulated wires.

*Groncki* does not involve new construction. There is need for further factual development before the Supreme Court could properly consider and decide that all reasonable persons would conclude that Detroit Edison should not have been required to do more to safeguard against the risk of mishaps of the kind that occurred in that case. The Supreme Court is obliged to hold that Detroit Edison, like every other seller of potentially dangerous products, has a duty to take reasonable—not ruinous—precautions to protect the public from known, and thus foreseeable, risks of harm.

209 Mich App 495; 531 NW2d 724 (1995) affirmed in part and reversed in part.

*Simkins & Simkins, P.C.* (by *Anne T. Craig* and *Sheila R. Thorp*), for the plaintiffs in *Groncki.*

*Cubbon & Associates Co., L.P.A.* (by *Stuart F. Cubbon*), for the plaintiffs in *Bohnert.*

*Michael J. Mangapora* for the plaintiffs in *Parcher.*

*Plunkett & Cooney, P.C.* (by *Ernest R. Bazzana*), for defendant Detroit Edison Company.

*Conlin, McKenney & Philbrick, P.C.* (by *Allen J. Philbrick*), for defendant Carrington Homes, Inc.

Amici Curiae:

*James E. Brunner* and *Catherine M. Reynolds* for Consumers Power Company.

*Clark Hill P.L.C.* (by *Duane L. Tarnacki* and *J. Walker Henry*), for Michigan Manufacturers Association.

*Grylls, Facca, Richter & Pregler, P.C.* (by *Patrick A. Facca*), for AGC Greater Detroit Chapter, AGC Michigan Chapter, and Associated Carpenter Contractors of Michigan, Inc.

BRICKLEY, C.J. These cases were combined for review because they all concern allegations of negligence on the part of a power company resulting in harmful contact with uninsulated overhead power lines. Each of the cases against Detroit Edison was decided on summary disposition regarding the issue of duty. This Court reviews summary judgments de novo and must review the entire record to see if the defendant was entitled to summary disposition. *Adkins v Thomas Solvent Co*, 440 Mich 293, 302; 487 NW2d 715 (1992). The existence of a legal duty is a question of law for the Court to decide. *Trager v Thor*, 445 Mich 95; 516 NW2d 69 (1994).

Also before the Court is Barbara Bohnert's suit against defendant Carrington Homes, Inc. This suit alleges that Carrington is also liable for the electrocution death of her husband under *Funk v General Motors Corp*, 392 Mich 91; 220 NW2d 641 (1974). This case was also decided by a grant of summary judgment for the defendant, which was reversed by the Court of Appeals. Therefore, the standard of review is

also de novo. The issues relating to Carrington will be discussed separately from those concerning Edison.

## I. FACTS

### A. *PARCHER v DETROIT EDISON*

Theodore Parcher[1] was electrocuted while moving a twenty-nine-foot high scaffold on a forklift on July 25, 1990. He was twenty-nine years old at the time of the accident and was working as a forklift operator at the construction of a supermarket. The power lines were sixty-five feet from the building, and thirty-five feet above the ground. The accident occurred as Mr. Parcher attempted to reverse around a pile of debris, bringing the scaffolding into contact with the power lines. Edison owned and operated the lines at the time of the accident, knew of the ongoing construction, and had agreed to move one of the poles to accommodate a parking lot that was being built along with the building. The power lines had been in place for a number of years before the construction began. Further, Mr. Parcher's employer had warned workers at the site of the presence of the power lines. Mr. Parcher's injuries resulted in the amputation of his right arm, right leg, and left foot.

The defendant was granted summary disposition on December 23, 1992. This decision was affirmed by the Court of Appeals on January 24, 1995. In its opinion, the Court of Appeals found that the accident was not legally foreseeable and therefore, the defendant owed the plaintiff no legal duty. 209 Mich App 495; 531 NW2d 724 (1995).

---

[1] To avoid confusion, all plaintiffs will be referred to by surname.

### B. *GRONCKI v DETROIT EDISON*

Gerald Groncki was a maintenance supervisor at a condominium complex and was injured when a ladder that he was moving came into contact with an uninsulated overhead electrical line. As a result, the plaintiff went into cardiac arrest and suffered burns of his left foot. He remained in the hospital for approximately ten days and a toe on his left foot was amputated. Mr. Groncki also alleges that various cognitive difficulties and personality changes resulted from his injuries. Mr. Groncki's wife has also filed a loss of consortium claim.[2]

On the day of the accident, Mr. Groncki was working on the roof of a condominium with another employee. The men were using a twenty-four-foot aluminum ladder to gain access to the roof. Mr. Groncki had warned the other worker about the danger of working near the power lines. After the other employee left to work in a different area, Mr. Groncki attempted to move the ladder by himself. Unfortunately, he lost control of the ladder, which fell onto the power lines. The power lines where twenty-one feet high and 14½ feet from the building. The lines had been in place for six years before the portion of the complex on which Mr. Groncki was working had been built. Further, Mr. Groncki worked on the construction of the complex and was familiar with its facilities.

Edison was awarded summary disposition by the circuit court on May 27, 1992. The Court of Appeals reversed this decision on December 27, 1994, in an

---

[2] As this opinion addresses the duty of Edison to Mr. Groncki, Mrs. Groncki's derivative claim does not require separate treatment.

unpublished opinion per curiam (Docket No. 153538). The Court of Appeals determined that it was foreseeable that someone using an aluminum ladder could be injured by the power lines. This ruling is now appealed by the defendant to this Court.[3]

### C. BOHNERT v DETROIT EDISON

This case concerns the fatal electrocution of Wendell Bohnert on October 10, 1989, at a home construction site.[4] Mr. Bohnert was a delivery man for National Cement Products of Toledo, Ohio. At the time of the accident, he was fifty-eight years old and had been delivering masonry supplies for National Cement Products for forty years. On October 10, 1989, Mr. Bohnert was delivering a load of cement blocks that had been ordered by the president of Carrington, Stephen Dick. No one was at the site when Mr. Bohnert arrived, so he began to unload his truck unsupervised. In doing so, despite the presence of specific warnings on the truck, Mr. Bohnert deployed the boom of his truck beneath power lines. Unfortunately, the boom touched the power lines and Mr. Bohnert was killed. The electrical lines were located

---

[3] Edison claims that the Court of Appeals expanded the scope of Mr. Groncki's allegations. It asserts that Mr. Groncki only alleged negligence in the placement of the wires, while the Court of Appeals determined that Edison was also negligent in failing to properly insulate the lines, not properly inspecting and repairing the lines, and failing to erect barriers around the lines. However, Mr. Groncki's complaint alleges that the defendant was negligent in its "construction, maintenance, operation, repair and/or inspection" of the lines. Given the requirements for pleading, the claims cited by the Court of Appeals were encompassed by the broad language of Mr. Groncki's complaint.

[4] The owners of the home, Roy and Ernestine Adkins, were initially codefendants in the suit. However, unlike Carrington and Detroit Edison, the plaintiff did not appeal the award of summary disposition for them. Thus, the Adkinses are no longer parties to this lawsuit.

twelve feet from the house and at a height of twenty-six feet. The power lines were uninsulated. Edison, who owned and controlled the lines, was aware of the construction and had inspected the site. Edison refused to insulate or move the power lines free of expense, but informed the homeowner that this could be done for a fee. However, Edison reviewed the planned location of the house and requested that the homeowners move it four feet farther away from the lines in order to achieve a twelve-foot clearance. The homeowners complied with this request.

The plaintiff, Mr. Bohnert's wife, alleges that Edison was negligent in failing to insulate, relocate, or de-energize the wires, and in failing to warn her husband of their presence. Mrs. Bohnert also alleges that Carrington, a licensed general contractor, is liable as a general contractor under this Court's decision in *Funk*. Carrington disputes this and claims to have been one of many subcontractors performing work on a "cost plus" basis. Carrington argues that it only performed construction as requested by the homeowners, who were their own general contractors. However, a local ordinance requires a licensed general contractor to manage the construction. Furthermore, Mr. Dick, the president of Carrington, gave deposition testimony that Carrington was the general contractor. Further, Carrington claimed to have been the general contractor during oral argument before the circuit court.

Both Edison and Carrington were awarded summary disposition in circuit court. However, these decisions were reversed by the Court of Appeals in an unpublished opinion per curiam (Docket No. 158314). The Court of Appeals found that there was a question

of fact regarding whether the injury was foreseeable by Edison and whether the site was a common work area under the authority of Carrington. Both defendants Edison and Carrington appeal this ruling.

## II. CLAIMS ASSERTED AGAINST DETROIT EDISON

### A. STATEMENT OF LAW APPLICABLE TO EACH PLAINTIFF

The scope of the duty owed by electrical companies to move, insulate or de-energize overhead power lines is a question of foreseeability. *Schultz* v *Consumers Power Co*, 443 Mich 445, 452; 506 NW2d 175 (1993). Utility companies, particularly electric companies, are charged with a duty to protect against foreseeable harm. *Id.*

In *Dees v L F Largess*, 1 Mich App 421; 136 NW2d 715 (1965), the plaintiff was electrocuted when a crane came into contact with overhead power lines owned by Detroit Edison. The plaintiff, a construction worker, was holding a hook hanging from a crane when the crane's cable contacted a power line. The Court of Appeals upheld a directed verdict for Detroit Edison. The Court found that Detroit Edison was not negligent in failing to anticipate that a skilled workman, with full knowledge of the wires, would come into contact with these wires through the cable of a crane. *Id.* at 427.

In *Koehler v Detroit Edison Co*, 383 Mich 224; 174 NW2d 827 (1970), the plaintiff was killed while riding on the arm of a crane as part of his employment at a construction site, when the crane's arm came into contact with overhead electrical cables. This Court upheld the trial court's determination that the electrical company owed no duty to the plaintiff, despite its

knowledge of the construction. *Id.* at 231. In reaching this conclusion, this Court stated:

> The mere fact that Detroit Edison knew a building was under construction near its power line and that, from time to time, mobile cranes were being brought upon the premises to be used in construction work, would not, standing alone, create a duty upon Detroit Edison to remove the charge, insulate the line, or notify the parties of a dangerous condition. [*Id.*]

Thus, because Detroit Edison could not anticipate that cranes on construction sites would contact its power lines, it owed no duty to that plaintiff.

The Court of Appeals revisited the issue in *Ransford v Detroit Edison Co*, 124 Mich App 537; 335 NW2d 211 (1983). In that case two men were electrocuted, and the plaintiff's decedent killed, when the wire-guided model planes they were flying crashed into electrical wires. *Id.* at 541-542. The Court found that there was no duty on the part of the power company because the occurrence was completely unforeseeable. *Id.* at 546. Rather, it stated that liability could not be based on such purely fortuitous circumstances. *Id.* Further, the Court explained that the issue of foreseeability should be determined at the time the lines were installed. *Id.*

This Court last spoke on this issue in *Schultz v Consumers Power Co, supra.* That case involved the death of a homeowner when a ladder that he was holding came into contact, either directly or through an electric arch, with a power line. The electric line had been placed 15½ feet away from the preexisting house. At the time of the accident, the line was frayed and pitted. In finding a duty, this Court noted that

electrical companies occupy a special role as providers of an essential, yet extremely dangerous commodity. *Id.* at 450-451. This special relationship with the public was found to impose a duty upon electrical companies to "reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id.* at 451. The Court also formulated a test to determine when this duty existed in a particular case:

> The test to determine whether a duty was owed is not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure. [*Id.* at 452.]

The Court determined that an accident involving a homeowner was foreseeable, given the location and disrepair of the power line.

The plaintiffs in *Parcher* and *Bohnert* also allege that Edison owed a duty to warn of the presence of dangerous power lines.[5] However, there is no duty to warn someone of a risk of which that person is aware. *Bullock v Gulf & Western Mfg*, 128 Mich App 316; 340 NW2d 294 (1983). Specifically, there is no duty to warn of known overhead power lines. *Wilhelm v Detroit Edison Co*, 56 Mich App 116; 224 NW2d 289 (1974) (finding no duty to warn severally, but finding a question of fact because the plaintiff believed the lines to be insulated). Further, the duty to warn only arises when there is a foreseeable vic-

---

[5] At oral argument, Mr. Groncki's counsel stated that her case did not involve a duty to warn.

tim. Thus, this duty, like the duty to inspect and repair, does not arise where it is not foreseeable to Edison that the plaintiff would come into harmful contact with the wires.

### B. APPLICATION

#### 1. *PARCHER v DETROIT EDISON*

The Court of Appeals correctly found that no duty arose on the part of Edison to protect Mr. Parcher. This case is closely analogous to *Dees* and *Koehler*. Edison, like the defendant in *Dees*, could not have reasonably foreseen that a skilled workman, with full knowledge of the power lines, would bring a crane into contact with those power lines. As in *Koehler*, Edison knew that there was ongoing construction, but had no reason to know that any high profile machinery would be used near its power lines. Therefore, under *Dees* and *Koehler*, Edison did not owe a duty to Mr. Parcher.

Similarly, the circumstances of Mr. Parcher's accident are fortuitous. The forklift Mr. Parcher was driving only came into contact with the wire because Mr. Parcher was transporting an uncollapsed scaffold while reversing around a pile of debris. Edison could not have reasonably foreseen that a worker would reverse around a pile of debris and bring a twenty-nine-foot high uncollapsed scaffold into contact with its electric wire. Thus, summary disposition was appropriate because these events were not foreseeable, and, therefore, no duty arose. *Ransford, supra.*

Further, this was not a poorly maintained wire that had been placed close to a home as in *Schultz*. Rather, this wire was on a commercial construction site and was sixty-seven feet from the building at a

height of thirty-five feet. Not only is there no evidence showing that this wire was not adequately maintained, but the distance from the building is sufficient to make this accident unforeseeable. Thus, *Schultz* is easily distinguishable from this case.

Finally, Edison did not owe Mr. Parcher a duty to warn. Mr. Parcher's contact with the wire was clearly unforeseeable, and, thus, no duty to warn arose. Further, Mr. Parcher had been warned about the wires by supervisors on the job site. Thus, Mr. Parcher was fully aware of the presence of the wires. Edison owed no duty to warn about a known danger. *Wilhelm, Bullock, supra.*

### 2. *GRONCKI v DETROIT EDISON*

Mr. Groncki alleges that Edison owed him a duty to: inspect, repair, and insulate the power lines; place the lines in a safe location; and erect safety barriers around them. Similar to the allegations of Mr. Parcher, Mr. Groncki's claim rests on the question of foreseeability. The Court of Appeals reversed the trial court's grant of summary judgment, finding that Edison owed a duty to Mr. Groncki. We disagree and restore the award of summary disposition for Edison.

Mr. Groncki bases his claim on *Schultz*' language that a power company owes a duty on the basis of "the probability that injury might result from any reasonable activity done on the premises for business, work or pleasure." *Schultz* at 452. Mr. Groncki claims that he was engaged in reasonable activity while repairing the roof of the condominium and, therefore, was owed a duty by Edison. However, there are several facts that distinguish this case from *Schultz*. In *Schultz*, the probability of injury was based upon a

frayed line that had been placed next to a preexisting structure. Further, the plaintiff in *Schultz* was a homeowner making repairs to his own home. In this case, there is no evidence suggesting that the line was in poor condition or was not properly maintained. Further, Mr. Groncki was not a homeowner unfamiliar with the dangers of electric lines. Rather, he was an experienced workman who was fully aware of the presence of the wires. Indeed, he warned a coworker to take exceptional care around the power lines. Thus, it was not foreseeable that he would ignore his own warnings and attempt to move the fully extended metal ladder himself,[6] and Edison owes no duty to Mr. Groncki.

### 3. *BOHNERT v DETROIT EDISON*

The Court of Appeals erred in overturning the grant of summary disposition on Mrs. Bohnert's claim against Edison. Mr. Bohnert's injury was not foreseeable to Edison. Therefore, Edison owed no duty to warn Mr. Bohnert or to move, insulate, or de-energize the power lines. As in *Dees*, Mr. Bohnert was a skilled and experienced workman with years of experience. Indeed, Mr. Bohnert had been delivering masonry supplies for forty years. Further, Mr. Bohnert had knowledge of the dangers of operating the boom on his truck near power lines. Indeed, there was a warning

---

[6] Edison also argues that it met applicable safety standards set forth by the National Electric Safety Commission and adopted by the Michigan Public Service Commission. 1991 AACS, R 460.813. However, as recognized in *Schultz*, "An argument on the basis of industry standards, therefore, goes to the question whether a defendant breached its duty of ordinary care, not whether a duty existed." *Schultz* at 456. Thus, the NESC standards are not applicable to the appeal before this Court, which solely concerns the issue of duty.

against such operation only a few inches above the boom's controls. Simply put, it was not foreseeable to Edison that an experienced, skilled workman would disregard clear instructions and operate his delivery vehicle directly beneath power lines. Thus, no duty arose on the part of Edison to plaintiff.

Further, Edison had not been notified that any type of machinery would be operating at that location on that day. It clearly had no knowledge that a large delivery truck equipped with a boom would be operated directly beneath its lines. While Edison did know that a house was being built at that location and could reasonably expect that machinery would be used, this degree of knowledge was found insufficient to create a duty in *Koehler*. Plaintiff's argument that the driveway was the only place where such material could be delivered does not change this conclusion. Edison cannot be expected to know all probable delivery locations on any given construction site. Rather, it can reasonably expect that trained workmen will not operate delivery vehicles directly under power lines or, if such operation is required, will properly inform Edison.

The mere location of the power line does not impose a duty on Edison. While this line was closer than that in *Schultz*, there are significant factors that distinguish this case. First, there is no evidence that the power line in this case was in disrepair. In *Schultz*, the wire was pitted and frayed and susceptible to arching. Secondly, the power line had been placed in its location by Edison before the commencement of construction. In *Schultz*, the power company had placed the line dangerously close to a preexisting house. Indeed, Edison had informed the

homeowners in this case of the danger of building too close to power lines, and had convinced them to move the structure several feet to achieve additional clearance. These factors weigh in favor of not imposing a duty on Edison.

### C. PUBLIC POLICY CONSIDERATIONS

Public policy also mitigates against the imposition of a duty in these cases. Sound public policy is a factor in deciding duty. *Sizemore v Smock*, 430 Mich 283, 293; 422 NW2d 666 (1988); *Antcliff v State Employees Credit Union*, 414 Mich 624, 630-631; 327 NW2d 814 (1982), see also Prosser & Keeton, Torts (5th ed), § 53, p 358. As this Court has recognized, "Social policy must intervene at some point to limit the extent of one's liability." *Sizemore* at 293. Further, these plaintiffs contend that the duty to inspect and repair imposed by *Schultz* includes the duties to relocate, insulate, de-energize, warn, and erect safety barriers around power lines. *Schultz* at 455. Inasmuch as such a holding would expand *Schultz*, it is proper that this Court consider the public policy ramifications of such a decision.

The social policy at issue is the public's need for electric power at a reasonable cost. To impose a duty to relocate, insulate, or de-energize power lines whenever third parties construct buildings near power lines would interfere with this policy. The costs of insulating or moving these lines would be significant. Edison alone has over 35,000 miles of power lines in this state. To impose the duty the plaintiffs request would certainly amount to a huge cost that would be passed on to the consuming public. Further, it may

often be impossible for Edison and other power companies to move power lines away from new construction without moving them closer to preexisting structures. In any event, the costs of injuries such as those suffered by these plaintiffs will have to be met in another societal forum.

### III. *BOHNERT v CARRINGTON HOMES*

The Court of Appeals correctly overturned the award of summary disposition for Carrington. The liability of Carrington is governed by *Funk, supra. Funk* involved an elevated work area shared by many subcontractors and created an exception to the general rule that a general contractor is not liable for the injuries of a subcontractor's employee.

> We regard it to be a part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen. [*Id.* at 104.]

Thus, for there to be liability under *Funk*, there must be: 1) a general contractor with supervisory and coordinating authority over the job site, 2) a common work area shared by the employees of more than one subcontractor, and 3) a readily observable and avoidable danger in that common work area, 4) that creates a high degree of risk to a significant number of workers.

Carrington seeks to avoid liability by arguing that it was not a general contractor with supervisory control over the work area. It claims merely to be one of

many subcontractors hired by the homeowners. However, the president of Carrington stated in his deposition that Carrington was the general contractor. Furthermore, he admitted that he ordered the supplies Mr. Bohnert was delivering and normally supervised this type of delivery. Finally, Carrington took the position that it was the general contractor before the circuit court. Thus, considering these facts in the light most favorable to the nonmoving plaintiff, there is a genuine question of material fact with regard to whether Carrington was the general contractor and had supervisory and coordinating control over the workplace.

Further, a question of fact exists regarding the presence of a common work area. In *Erickson v Pure Oil Corp*, 72 Mich App 330; 249 NW2d 411 (1976), the Court of Appeals found that for a common work area to exist there must be an area where the employees of two or more subcontractors will eventually work. This holding was reaffirmed by the Court of Appeals in *Phillips v Mazda Motor Mfg*, 204 Mich App 401, 408; 516 NW2d 502 (1994). Carrington argues that this rule unduly extends *Funk*, creating liability any time employees of different contractors will eventually work in the same location. The common work area, however, is only one element of *Funk*. The mere presence of a common work area, without supervisory control by the general contractor and a readily observable and avoidable risk to a significant number of workers, will not necessarily impose liability. Thus, *Erickson* was not an improper extension of *Funk*, but merely established the test for one of *Funk*'s four elements.

However, there is a question of fact regarding whether employees of other subcontractors would be working in this area. The area in question appears to be the main driveway into the construction site. Mrs. Bohnert claims that this was used by all workmen on the project. Carrington simply asserts that Mr. Bohnert was the only person who worked in that area because he was the only person injured there. This dispute presents an unresolved factual question. Therefore, summary judgment is not appropriate at this juncture.

We also note that a factual question exists regarding the presence of a readily observable, avoidable risk to a significant number of workmen. Carrington argues that the line was in the plain view of Mr. Bohnert. Therefore, there is at least a question of fact with respect to whether it was observable to Carrington. The parties also dispute the feasibility of safety precautions that may have avoided any risk posed by the power line. Finally, there is a dispute about the number of employees exposed to any such risk. Mrs. Bohnert claims that most, if not all, the workers and their equipment passed along this driveway and directly beneath the power line. To support this claim, Mrs. Bohnert alleges that this driveway was the only feasible means of access to the construction site. Carrington asserts that this is not the case. Once again, this conflict demonstrates a question of fact that renders summary disposition inappropriate.

It is consistent to impose a duty for this accident on Carrington, but not on Edison. Edison could not foresee the accident because it was not informed that Mr. Bohnert would be operating a crane-like delivery

truck beneath its wires. However, if Carrington is shown to have had sufficient control of the job site, it may have been aware of the likelihood of this accident. Further, when the elements of *Funk* are satisfied, a general contractor is presumed to have been able to foresee that readily observable and avoidable risks will lead to accidents and injuries. Thus, this accident may have been foreseeable with respect to Carrington, but not to Edison. However, at this juncture there are material questions of fact with respect to each of the elements of *Funk*. Thus, summary disposition was not proper and the Court of Appeals decision reversing the judgment of the trial court is correct.

CONCLUSION.

Therefore, I would affirm the judgment of the Court of Appeals in *Parcher*, reverse in *Groncki*, and affirm in part and reverse in part in *Bohnert*. The claims against Edison should be dismissed, and Mrs. Bohnert's suit against Carrington remanded to the circuit court for further proceedings consistent with this opinion.

BOYLE, J., concurred only in the result.

MALLETT, J. (*concurring in part and dissenting in part*). I concur with the lead opinion's holdings in both *Parcher v Detroit Edison* and *Bohnert v Detroit Edison*. However, I disagree with the lead opinion's conclusion that Detroit Edison is not liable for the injuries in *Groncki* because it was not foreseeable that this plaintiff would come into harmful contact with the overhead power lines. I agree with the Court of Appeals holding reversing the grant of summary

disposition in favor of the utility, and would remand to the trial court for further fact finding with regard to the general negligence claim. A more complete record from which to assess the liability of the utility in this case needs to be provided concerning the proximity of the wires to the building and to the ground. *Groncki v Detroit Edison Co*, unpublished opinion per curiam, issued December 27, 1994 (Docket No. 153538), slip op at 1, 3. In holding that there is no duty in *Groncki*, the Court gives too narrow a reading to our holding in *Schultz v Consumers Power Co*, 443 Mich 445; 506 NW2d 175 (1993). Such restriction is inconsistent with basic principles of negligence law that the lead opinion fails to address.

"A negligence action may only be maintained if a legal duty exists which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Riddle v McLouth Steel Products Corp*, 440 Mich 85, 96; 485 NW2d 676 (1992). In assessing whether to impose a duty courts must evaluate several factors, among which are the relationship of the parties, the foreseeability of harm, and the nature of the risk itself. *Buczkowski v McKay*, 441 Mich 96, 100; 490 NW2d 330 (1992). Whether a duty will be found to exist is a question of law for the court. *Trager v Thor*, 445 Mich 95, 105; 516 NW2d 69 (1994). Once a legal duty is established, a breach of that duty is required for liability to attach. Whether the duty has been breached is a question of fact for the jury. *Riddle, supra* at 96.

In determining whether the relationship between the parties is sufficient to establish a duty, the proper

inquiry is " 'whether the defendant is under any obligation for the benefit of the particular plaintiff' . . . ." *Buczkowski, supra* at 100, quoting *Friedman v Dozorc,* 412 Mich 1, 22; 312 NW2d 585 (1981). This analysis concerns whether the relationship of the parties is such that a legal obligation should be imposed on one for the benefit of another. *Id.,* citing Prosser & Keeton, Torts (5th ed), § 53, p 356. "Only if the law recognizes a duty to act with due care arising from the relationship of the parties does it subject the defendant to liability for negligent conduct." *Friedman, supra* at 22. In assessing the sufficiency of the relationship and whether to impose a duty, this Court has noted that "[i]t is well established that those who undertake particular activities or enter into special relationships assume a distinctive duty to procure knowledge and experience regarding that activity . . . ." *Schultz, supra* at 450.

This inquiry is of critical importance where a company is involved in an inherently dangerous enterprise such as the delivery of electricity. The necessary relationship arises out of the nature of the activity. The provision of electricity and electric power is one of those particular activities in which the provider assumes a distinctive duty. Accordingly, we held that it is the responsibility of the electric company, as a provider of an inherently dangerous commodity, in its superior position of knowledge and expertise, to execute its activities through the exercise of reasonable care to reduce the risk of harm as far as practicable. *Id.* at 451. We noted in *Schultz* that, "[w]here service wires erected and maintained by an electric utility company carry a powerful electric current, so that persons coming into contact with or proximity to

them are likely to suffer serious injury or death, the company must exercise reasonable care to protect the public from danger." *Id.* at 453-454.

Even though the reasonable person is charged with the knowledge of the dangerous propensities of electricity, the utility still has the duty and obligation "to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id.* at 451. Indeed, other courts have similarly held that, " 'where high-voltage lines were strung between closely spaced private residences, the risk to be foreseen was of the highest order; thus, the corresponding duty devolving upon the power company must be considered equally great.' " *Id.* at 455, quoting *Miner v Long Island Lighting Co*, 40 NY2d 372, 379; 353 NE2d 805 (1976).

In addition is the requirement of foreseeability, that is, whether the reasonable person not only could anticipate the likelihood that a particular event would occur, but that such an event would pose a risk of injury or harm to a person or property. *Samson v Saginaw Professional Bldg, Inc*, 393 Mich 393, 406; 224 NW2d 843 (1975). In *Samson*, we stated:

> Foreseeability . . . depends upon whether or not a reasonable man could anticipate that a given event might occur under certain conditions. But the mere fact that an event may be foreseeable does not impose a duty upon the defendant to take some kind of action accordingly. The event which he perceives might occur must pose some sort of risk of injury to another person or his property before the actor may be required to act. . . . Negligence . . . is not found to exist unless an actor, who is under a duty to act, fails to act after he has perceived or should have perceived an unreasonable risk of harm to another.

Consequently, as pointed out in *Schultz*, it is altogether possible for a reasonable person to anticipate both that an individual performing routine maintenance on his home could become electrocuted if his aluminum ladder came into contact with the overhead power line and that this could cause serious injury or death. *Id.* at 452. The message in *Schultz* is clear that "[t]hose engaged in transmitting electricity are bound to anticipate ordinary use of the area surrounding the lines and to appropriately safeguard the attendant risks." *Id.* The appropriate test is not "whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure." *Id.* Accordingly, we held that Consumers Power owed "a duty to reasonably install its power lines so as to safeguard the public from foreseeable injuries." *Id.* at 458. Thus, it was determined that it was foreseeable that a homeowner could become injured while performing routine maintenance on his dwelling and that the utility is duty bound to safeguard against such risks as far as practicable.

In holding that the utility has no duty in *Groncki*, the lead opinion interprets too narrowly our holding in *Schultz*. The lead opinion places far too much emphasis on the fact that, like the plaintiffs in *Bohnert* and *Parcher*, the plaintiff in *Groncki* was an experienced maintenance worker who knew about the dangers of power lines and had even warned

other workers about them.[1] *Ante* at 660-661. Accordingly, the lead opinion posits that *Groncki* should be governed by *Koehler v Detroit Edison Co*, 383 Mich 224; 174 NW2d 827 (1970), and its progeny, like *Parcher* and *Bohnert*, rather than *Schultz*.[2] These cases really represent a continuum of liability with *Koehler*, finding no duty, on one end, and *Schultz*, imposing a duty, on the other. However, there are significant differences between *Groncki*, on the one hand, and *Parcher*, *Bohnert*, and *Koehler*, on the other, that the opinion fails to consider, which bring it closer to the holding in *Schultz*.

The *Koehler-Bohnert-Parcher* trilogy involved construction sites where new building was taking place. The work space in which the construction activities took place was ample for the activities to occur. The victims in these cases were extremely experienced at operating heavy equipment, whether a forklift, masonry delivery truck, or crane, and ignored their

---

[1] Counsel for the plaintiffs-appellees disputed that Mr. Groncki was truly experienced. Noting that he had only a high school education and was a laborer, albeit with some construction experience, counsel charged that he could not be

saddle[d] . . . with the knowledge, the cumulative knowledge that Detroit Edison has in dealing with power lines. . . . Mr. Groncki was and is a maintenance man. Mr. Groncki never took any formal courses or had any specific training in the area of electricity, and he has no specialized knowledge or expertise as to the hazards of uninsulated electrical lines, beyond that which all persons are generally aware.

[2] *Koehler* was electrocuted while riding on a sling or wire cable attached to a crane in order to perform two tasks at a time on a construction site with too few workers. He was attaching a hook on the end of the crane to material in a truck and riding up with it to the wall or roof where the material was attached and then riding down. He repeated this several times, in spite of several warnings, and was electrocuted. *Koehler, supra* at 229.

own occupational safety instructions and warnings. They knew about the danger and the need to stay away from overhead wires. *Ante* at 650, 652, and 654-655. Accordingly, in *Koehler*, we held that

> [t]he mere fact that Detroit Edison knew a building was under construction near its power line and that, from time to time, mobile cranes were being brought upon the premises to be used in construction work, would not, standing alone, create a duty upon Detroit Edison to remove the charge, insulate the line, or notify the parties of a dangerous condition. We agree with the finding of the trial judge that there was no negligence on the part of Detroit Edison. [*Id.* at 231.]

Clearly, under these circumstances, the injuries were not foreseeable, but the result of fortuitous events not readily anticipated or caused in any way by the negligence of the utility, and thus liability could not attach.

On the other side of the spectrum is *Schultz*, which involved a homeowner and his friend, who was electrocuted while house painting. The lead opinion notes that we found this kind of incident to be "foreseeable, given the location and disrepair of the power line." *Ante* at 656. This is only partially correct. By restricting the holding in *Schultz* to homeowners repairing their homes, the lead opinion misses the greater significance of *Schultz*. In *Schultz*, the critical factors to finding a duty were the placement and condition of the wires, whether it was foreseeable that reasonable maintenance would take place, and whether this maintenance could be executed with reasonable safety given the placement and condition of the

wires.[3] In *Groncki,* as in *Schultz,* even though there was no allegation that the wire was in disrepair, and in spite of his alleged experience, it is still altogether possible that the plaintiff simply could not perform routine maintenance tasks without confronting an unreasonable risk of harm because of inadequate work space. Therefore, Edison breached its duty to reasonably inspect and install its lines. This is underscored by the fact that the condominium complex grew up among the original wires and that with subsequent construction the distances between the wires and the buildings decreased to a point where repairs could not reasonably be undertaken and that injuries were therefore foreseeable.

Notwithstanding Groncki's knowledge and experience or the fact that the power lines complied with the Public Safety Commission regulations, the Court of Appeals charged the electric company with the duty that it "must exercise reasonable care to reduce potential hazards as far as practicable."[4] *Schultz* at

---

[3] In a separate concurrence, Chief Justice CAVANAGH, joined by Justice LEVIN, emphasized that, in addition to the duty to inspect and maintain, the utility must exercise reasonable care in positioning its uninsulated power lines.

> [I]n resolving this case, I would focus less on the *condition* of the wire and more on its *position.* [*Schultz* at 460.]

Chief Justice CAVANAGH noted that the house in this case was built before the wires were brought into the area and that the utility should have "anticipated that someone might attempt the not unusual task of painting that home," with a tall ladder when installing the lines. *Id.* (citation omitted).

[4] The power lines were in place six years before the condominium on which Groncki was working was built. The lines were twenty-one feet high, and 14½ feet away from the building. *Ante* at 651. This is closer to the building than the wire in *Schultz,* which was 15½ feet from the house and twenty-four feet high. *Id.* at 448. Even though these distances com-

451. As the lead opinion notes, "electrical companies occupy a special role as providers of an essential, yet extremely dangerous commodity." *Ante* at 656, citing *Schultz.* Therefore, it is incumbent upon the utility to "reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id.* In this case, the proximity of the power lines to the condominium may have created such a hazardous condition. There simply may not have been ample space for the work to reasonably have been completed. Edison is under a duty to inspect and remedy such hazards as far as practicable where it is foreseeable that a maintenance worker or homeowner could become electrocuted while performing routine maintenance tasks.

 · The utility is charged with the responsibility and duty to inspect, discover, and remedy hazardous conditions to prevent foreseeable injuries. Both public policy and the protection of the public command this result. I disagree that this will have the dire economic consequences asserted of by the lead opinion. Therefore, I respectfully dissent from the lead opinion's position in *Groncki v Detroit Edison,* and would remand this case to the trial court for further fact

---

plied with the Michigan Public Safety Commission regulations (or the National Electric Safety Code, which the MPSC has adopted), the Court of Appeals noted that this does not preclude the plaintiff's claim. This Court has held that compliance with industry standards is not an absolute claim of defense to a claim of negligence. *Id.* at 456. Compliance is evidence of due care and "whether a defendant breached its duty of ordinary care, not whether a duty existed." *Id.* Whether the defendant was negligent or breached its duty is a factual issue for the trier of fact to determine. See *Groncki v Detroit Edison Co,* unpublished opinion per curiam, slip op at 3 (citation omitted). Further, it is important to note that the safety standards represent only the minimum requirements and that circumstances might exist requiring a higher standard. *Schultz* at 456-457 (citations omitted).

finding to determine whether the injury was foreseeable, and whether Edison's conduct fell below the standard of care. This evaluation should include an analysis of the type of activity performed, the distance of the power lines from the activity, and whether the activity could be performed or carried out with reasonable safety within that space.

CAVANAGH, J., concurred with MALLETT, J.

RILEY, J. (*concurring in part and dissenting in part*). I agree with the lead opinion that defendant Detroit Edison did not have a duty as a matter of law to any of the three plaintiffs because it could not have reasonably foreseen that someone would be injured in the particular circumstances of each case. Therefore, I join part II of the opinion, which concludes that the trial court properly granted summary disposition in favor of defendant Detroit Edison in all three cases.

However, I cannot join part III of the lead opinion regarding the issue of general contractor liability in *Bohnert v Detroit Edison*. Because I agree with the lead opinion that Wendell Bohnert's injury was not foreseeable to defendant Detroit Edison as a matter of law, I further conclude that there was not a "high degree of risk" presented by the overhead electrical lines to Bohnert for defendant Carrington Homes, the general contractor, as a matter of law. Hence, I respectfully dissent. I would reverse the Court of Appeals decision and reinstate the trial court's grant of summary disposition in favor of Carrington.

I

As the lead opinion states, this Court has established that a general contractor has a duty on a construction project (1) to take reasonable steps within its supervisory and coordinating authority (2) to guard against readily observable, avoidable dangers (3) in common work areas that (4) *create a high degree of risk* to a significant number of workers. See *Funk v General Motors Corp,* 392 Mich 91, 104; 220 NW2d 641 (1974). See also *Plummer v Bechtel Construction Co,* 440 Mich 646, 666 (LEVIN, J.), 669 (BOYLE, J.); 489 NW2d 66 (1992) (affirming *Funk*). I do not believe that there is an issue regarding whether the electrical power lines created a high degree of risk to Bohnert.

In examining whether there was a foreseeable risk to Bohnert for defendant Detroit Edison, the lead opinion concludes that "it was not foreseeable to Edison that an experienced, skilled workman would disregard clear instructions [on the boom] and operate his delivery vehicle directly beneath power lines." *Ante,* p 660. For the same reason, I also believe that these power lines, which were not obscured by visual obstructions, did not present a high degree of risk to plaintiff as a matter of law when Stephen Dick of Carrington asked National Cement Products to deliver materials to the site.

The lead opinion claims that its conclusion that the electrical lines both (1) did not create a foreseeable risk of harm, but (2) did create a high degree of risk is "consistent" because Detroit Edison was not "informed that Mr. Bohnert would be operating a crane-like delivery truck beneath [the electrical power] wires." *Ante,* pp 664-665. Yet, this Court has

previously stated that even if an electric company
"knew a building was under construction near its
power line and that . . . *mobile cranes* were being
brought upon the premises," this would not by itself
indicate to the company that there was a reasonably
foreseeable risk to an employee performing work
involving the crane. See *Koehler v Detroit Edison Co*,
383 Mich 224, 231; 174 NW2d 827 (1970) (emphasis
added). Likewise, whether Carrington knew that
Bohnert would be bringing a truck with a boom onto
the worksite would not determine whether there was
a high degree of risk created by the electrical power
lines. Even if it were a factor to consider, there was
no dispute that National Cement Products did not call
Stephen Dick of Carrington to inform him that
Bohnert was coming to the site to deliver the cement
blocks on the day he attempted to deliver the materi-
als. Consequently, there is no dispute that Carrington
did not know that Bohnert was coming to the work-
site when he did.

The lead opinion also claims that "when the ele-
ments of *Funk* are satisfied, a general contractor is
*presumed* to have been able to foresee that readily
observable and avoidable risks will lead to accidents
and injuries." *Ante*, p 665 (emphasis added). Yet, this
analysis assumes its conclusion by asserting that
when the elements of the standard are met, i.e., when
there is a high risk of danger, the general contractor
is then presumed to foresee that these risks will lead
to accidents and injuries, i.e., that there is a high risk
of danger. This reasoning is circular.

Instead, this Court should recognize that, although
electrical power lines are "inherently dangerous"
requiring expertise, see *Schultz v Consumers Power*

*Co*, 443 Mich 445, 451; 506 NW2d 175 (1993), there was not a high degree of risk of injury for a delivery worker who had delivered concrete block for forty years when he drove onto a worksite with his truck that had two signs on its boom that read "Warning[:] Do Not Operate Within 10 Feet of Electric Power Lines." The electrical power lines were not obscured. In fact, the owners of the property, the Adkinses, had asked Detroit Edison to move the lines before the accident "mostly for looks."

The fact that the risk was not unreasonably high is underscored by plaintiff's own arguments and allegations. In Barbara Bohnert's first amended complaint, she does not allege how Carrington could have made the worksite safe from the alleged hazard. Plaintiff relies on the sworn affidavit of her expert, William Heilman, arguing that Carrington was obligated to "delay commencement of construction until such time as the overhead lines were covered, moved, buried, de-energized, or made safe by some other means . . . ." Yet, the authority to take such action rested with defendant Detroit Edison. Detroit Edison had already moved the electrical power lines a further distance away from the worksite at the request of the Adkins family. In concluding that there was an issue of fact regarding whether there was a high risk of danger with respect to only Carrington, the lead opinion's analysis thereby suggests that Carrington may have had a duty to have the electrical power lines moved or insulated to ensure that the worksite was reasonably safe even though Detroit Edison did not have a duty to move or insulate them because there

was no foreseeable risk of harm to anyone. I do not think such reasoning withstands close scrutiny.

II

Wendell Bohnert's death was a tragedy. However, it did not result, as a matter of law, from Carrington's failure to take some particular action at the worksite where the danger was not unreasonably high for an experienced delivery worker like Bohnert. I would reverse the Court of Appeals decision and reinstate the trial court's grant of summary disposition in favor of Carrington.

WEAVER, J. (*concurring in part and dissenting in part*). I agree with Justice RILEY's partial dissent and partial concurrence and concur with her conclusion, regarding part III of the lead opinion, that, as a matter of law, there was not a "high degree of risk" to Bohnert presented by the overhead electrical lines that would render defendant Carrington Homes, the general contractor, liable. Therefore, I agree with Justice RILEY that we should reverse the Court of Appeals decision and affirm the trial court's grant of summary disposition for this general contractor, Carrington Homes.

I write separately because I disagree with and would not follow *Funk v General Motors Corp*, 392 Mich 91; 220 NW2d 641 (1974), and its progeny *Plummer v Bechtel Construction*, 440 Mich 646; 489 NW2d 66 (1992). The lead opinion's disposition of this case on the basis of *Funk* exemplifies Justice COLEMAN's concerns about the unwarranted expansion of tort law, which were voiced in her dissent in *Funk*, as follows:

The majority opinion creates concepts which represent a significant departure from time tested theories of tort liability. . . . General contractors must now be prepared to assume responsibility for any injury received by the employee of a subcontractor, no matter how negligent the employee may be. [*Id.* at 116.]

RILEY J., concurred with WEAVER, J.

LEVIN, J. (*dissenting*). The lead opinion combines the separate questions of duty, negligence, and comparative negligence, and concludes prematurely on woefully inadequate summary disposition records and incomplete factual assessment that Detroit Edison could not have been expected to do anything to protect the injured and deceased workmen who, further, could have avoided injury had they been more alert and careful.

*Koehler v Detroit Edison Co*, 383 Mich 224, 231; 174 NW2d 827 (1970), although it speaks in negligence terminology, was decided at a time when any contributory negligence of the injured person precluded recovery. Now, the injured person's comparative negligence reduces, but does not preclude, recovery. The lead opinion defines duty to include in the calculus the fault of the particular injured person, here a worker, holding, in effect, that Detroit Edison has no duty to the comparatively negligent.

This redefinition of "duty" is brought about by asking, not whether injury to some person (worker—skilled or not—or nonworker) from unintentional contact with uninsulated electrical lines is foreseeable under ordinarily foreseeable circumstances, but rather whether negligent contact with uninsulated lines by a skilled worker should have been foreseen.

The lead opinion then conclusorily responds in the negative, ignoring that most injuries, including most workplace injuries, even of skilled workers, could be avoided if the injured person was at all times alert and careful and never made a mistake due to fatigue, momentary lapse, distractions, or other cause.

In *Schultz v Consumers Power Co*, 443 Mich 445, 452-454; 506 NW2d 175 (1993), this Court said:

> Those engaged in transmitting electricity are bound to anticipate ordinary use of the area surrounding the lines and to appropriately safeguard the attendant risks. The test to determine whether a duty was owed is not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure. . . .
>
> Where service wires erected and maintained by an electric utility company carry a powerful electric current, so that persons coming into contact with or proximity to them are likely to suffer serious injury or death, the company must exercise reasonable care to protect the public from danger. The degree of care required is that used by prudent persons in the industry, under like conditions and proportionate to the dangers involved, to guard against reasonably foreseeable or anticipated contingencies.[1]

---

[1] The Court continued:

Compliance with the NESC of an industry-wide standard is not an absolute defense to a claim of negligence. While it may be evidence of due care, conformity with industry standards is not conclusive on the question of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances. *Owens v Allis-Chalmers Corp*, 414 Mich 413, 422-423; 326 NW2d 372 (1982); 2 Restatement Torts, 2d, § 295A, p 62. An argument on the basis of industry standards, therefore, goes to the question whether a defendant breached its duty of ordinary care, not whether a duty existed. If the plaintiff can convince a jury that a reasonably prudent company would have

The Court concluded that "a power company has a duty to reasonably install its power lines so as to safeguard the public from foreseeable injuries." *Id.* at 458.

I would hold on the authority of *Schultz* that Detroit Edison had a duty to exercise due care to protect against reasonably foreseeable contact by workers, skilled and unskilled, as well as homeowners, with uninsulated lines.[2]

Clearly Detroit Edison is not required, as its counsel and amicus curiae extravagantly argue, to post guards twenty-four hours a day along over thirty thousand miles of uninsulated electrical lines. Nor should it be required to bury underground electrical lines at prohibitive cost and resulting excessive increase in utility costs to consumers, businesses, and others.

The lead opinion speaks of the cost of recognizing a duty in these three cases. The record indicates that temporary sleeves could be installed on wires near construction sites or streamers could be hung from uninsulated lines during the times of construction involved in *Bohnert* and *Parcher*. In both cases, Detroit Edison was made aware, well in advance of

---

taken auxiliary measures beyond those required by industry standards, then the jury is clearly at liberty to find that the defendant breached its duty, regardless of the industry's guidelines. [*Id.* at 456.]

[2] Because homeowners as well as workers are entitled to maintain an action, the concern addressed in *Funk v General Motors Corp*, 392 Mich 91, 112; 220 NW2d 641 (1974), is not present. See also *Smith v Allendale Mut Ins Co*, 410 Mich 685, 739; 303 NW2d 702 (1981).

the commencement of construction, that there would be the kind of construction that would bring to the site heavy equipment with cranes and booms. Detroit Edison had ample time to install plastic sleeves or streamers or otherwise temporarily mark these uninsulated lines.

The record is silent whether installing temporary sleeves, streamers, or other temporary measures are practical and effective, and is also silent concerning the cost of such installations in the instant cases.[3]

The record contains nothing about the frequency of the kind of accidents that occurred in these cases; how many homeowners, maintenance, construction, delivery men are injured or die as the result of accidental contact with uninsulated electrical lines in a year, two years, or five years. The record is silent concerning the number of times a year Detroit Edison might be called upon to install temporary sleeves, streamers, or take other temporary measures, and the cost of doing so.

The lead opinion, absent such record evidence, finds that the potential cost to Detroit Edison is so great that it relieves it of any duty to safeguard a "skilled" worker who knows of the risk and by mistake encounters an uninsulated line. No thought is given to other alternatives. This Court could appropriately suggest that Detroit Edison seek the approval of the Public Service Commission to assess the cost of temporary sleeves, streamers, or other measures against the business or other consumer of electricity as part of the installation cost of the new electrical

---

[3] There was deposition testimony from a Detroit Edison employee indicating that the cost of moving lines was not prohibitive.

service to the newly constructed structure. It might persuasively appear from a more complete record and thorough analysis that a different result might be required.

A different question would be presented if Detroit Edison were not aware of the new construction and had no time to take temporary measures in the areas where cranes and booms might encounter uninsulated lines.

*Groncki* does not involve new construction. I agree with my dissenting colleague that there is need for further factual development before this Court could properly consider and decide that all reasonable persons would conclude that Detroit Edison should not have been required to do more to safeguard against the risk of mishaps of the kind that here occurred.[4]

Whenever this Court rules as a matter of law that there is a duty or an absence of duty, it makes a policy assessment regarding the allocation of risk of loss, sometimes imposing it entirely on the injured person, other times transferring it to the defendant. However the Court decides, it has a choice and the choice is in a sense legislative. The Legislature has the last word, but until it acts, the Court's decision, either for or against the recognition of liability, is judicial lawmaking. In my opinion, the Court's obligation is to hold

---

[4] In *Groncki* and *Bohnert*, the uninsulated lines were less than fifteen feet from the building—the width of a small room.

One can visualize other cases where the uninsulated lines are hundreds or a greater number of feet from any facility and are hung at great height, and there is no indication that there will be construction activity in the area. That is not the situation in these cases.

that Detroit Edison, like every other seller of potentially dangerous products, has a duty to take reasonable—not ruinous—precautions to protect the public from known, and thus foreseeable, risks of harm.