*In re* SKIDMORE ESTATE (ON RECONSIDERATION)

Docket No. 323757. Submitted January 12, 2016, at Lansing. Decided
    January 19, 2016, at 9:05 a.m. Reconsideration granted and
    opinion vacated by Court of Appeals order entered May 24, 2016,
    and new opinion issued May 24, 2016, at 9:25 a.m. By order of
    the Michigan Supreme Court, 500 Mich 967 (2017), the May 24,
    2016 opinion reported at 315 Mich App 470 was vacated and the
    January 19, 2016 opinion reported at 314 Mich App 777 was
    reinstated and clarified.

    Ralph Skidmore, Jr., individually and as personal representative
        of the estate of Catherine D. Skidmore, deceased, brought an
        action in the Calhoun Circuit Court against Consumers Energy
        Company, alleging that Consumers failed to exercise reasonable
        care to maintain its power lines when an elevated power line fell
        in a residential area on a calm evening and that Consumers'
        negligence was a proximate cause of Catherine's death because
        Catherine was electrocuted by the downed power line in her
        neighbor's yard when she ran to the neighbor's house to warn
        the neighbor that his van was on fire. Consumers moved for
        summary disposition, alleging that it was not reasonably fore-
        seeable that Catherine would run to the house where the power
        line had fallen and that Consumers therefore owed her no duty.
        The court, James C. Kingsley, J., granted Consumers' motion for
        summary disposition. The Court of Appeals, SHAPIRO, P.J., and
        O'CONNELL and BORRELLO, JJ., reversed and remanded in an
        opinion issued on January 19, 2016. Both plaintiff and defen-
        dant timely moved for reconsideration, asserting that the Janu-
        ary 19, 2016 opinion required clarification. On May 24, 2016, the
        Court of Appeals, SHAPIRO, P.J., and BORRELLO, J. (O'CONNELL, J.,
        dissenting), granted both motions for reconsideration and va-
        cated the January 19, 2016 opinion.

        On reconsideration, the Court of Appeals *held*:

        1. To prove negligence, a plaintiff must show that a defen-
    dant owed the plaintiff a duty of care, the defendant breached
    that duty, the plaintiff was injured, and the defendant's breach
    caused the plaintiff's injury. A power company has a duty to

reasonably inspect and repair wires and other instrumentalities in order to discover and remedy defects, which involves more than merely remedying defective conditions actually brought to its attention. This duty includes an obligation to reasonably inspect for fraying power lines; however, this duty does not include guarding or warning against every possible contact with elevated power lines. In this case, defendant's duty to maintain its power lines in reasonable condition was directly at issue, and the allegation was that it was foreseeable that a failure to do so would result in a line falling to the ground, creating a new and distinct potential for electrocution, not that Consumers should have foreseen accidental contact with an elevated power line. Moreover, it was reasonably foreseeable that persons in a residential area would act in response to an emergency to aid a neighbor.

2. Consumers' argument that Catherine did not take reasonable care to avoid the power line that had fallen in the neighbor's yard failed on both factual and legal grounds. Factually, too many questions of fact remained for summary disposition to be appropriate, including whether Catherine understood that a power line had fallen when she ran toward the neighbor's house, whether any of the neighbors had called out to warn Catherine that a power line had fallen, and whether Catherine herself had seen the power line given that all the witnesses unanimously testified that it had been very dark that night, that there was no sparking or fire in the area where Catherine was walking, and that they had been unable to see the power line in the yard until Catherine made contact with it and the fire of her electrocution lit the area. Legally, Consumers' argument failed because it depended on treating this general negligence case as a premises liability case. The open-and-obvious-danger doctrine had no applicability because only a party that owns or controls the subject property may assert that its duty was limited by an open and obvious hazard. Consumers had neither ownership nor control of the property that its power line fell onto, and Consumers was not allowed to assert the legal privileges of that owner. The mere fact that the injury had occurred on a third party's premises did not transform this case about proper maintenance of high-voltage power lines into a premises liability case.

Reversed and remanded.

O'CONNELL, J., concurring in part and dissenting in part, concurred with the result reached and the reasoning regarding

duty in the opinion on reconsideration, but dissented from the portion of the majority opinion that rejected Consumers' arguments on both factual and legal grounds. Judge O'CONNELL would have denied the motions for reconsideration and remained with the analysis in the original opinion because the original opinion clearly recognized that the existence of a disputed question of fact regarding the reasonableness of Catherine's actions did not affect whether Consumers owed Catherine a duty and because the discussion of premises liability—an issue neither raised before the trial court nor argued by the parties on appeal or reconsideration—was unnecessary.

*Mark Granzotto, PC* (by *Mark Granzotto*), and *Kline & Specter, PC* (by *Shanin Specter* and *Charles L. Becker*), for Ralph Skidmore, Jr.

*Smith Haughey Rice & Roegge* (by *John R. Oostema, E. Thomas McCarthy, Jr.,* and *D. Adam Tountas*) and *Jacobs and Diemer, PC* (by *John P. Jacobs* and *Timothy A. Diemer*), for Consumers Energy Company.

ON RECONSIDERATION

Before: SHAPIRO, P.J., and O'CONNELL and BORRELLO, JJ.

SHAPIRO, P.J. Defendant, Consumers Energy Company, is an electrical utility and transmits high-power electricity over elevated wires. Shortly after dark, on July 19, 2011, one of Consumers' high-voltage power lines fell to the ground in a residential neighborhood. Catherine Skidmore (Cathy) was electrocuted when she came into contact with the fallen line. Plaintiff Ralph Skidmore, individually and as personal representative of his wife's estate, brought suit, alleging that the elevated power line fell due to a failure by

Consumers to exercise reasonable care to maintain its lines and that Consumers' negligence was a proximate cause of his wife's death. Consumers filed a motion for summary disposition, asserting that it was not reasonably foreseeable that Cathy would run to the house where the downed power line had fallen and that it therefore owed her no duty. The trial court agreed and granted summary disposition. We reversed and remanded. Both plaintiff and defendant timely filed motions for reconsideration asserting that our opinion required clarification, and we granted both motions. We again reverse and remand.

### I. FACTUAL BACKGROUND

Cathy was electrocuted as she ran onto the side yard of her across-the-street neighbor, Roddy Cooper, and came in contact with a high-voltage wire that was on the ground. The incident occurred after dark.

Cooper's house sat on the corner of Shirley Avenue and Winnifred Street. Its front door and enclosed porch faced onto Shirley, and it had a long side yard fronting on Winnifred with several windows. The Skidmores lived on Winnifred, directly across the street from Cooper's side yard. At the end of the long side yard, where the backyard began, there was a driveway on which Cooper's red van was parked.

### A. EYEWITNESSES TO THE INCIDENT

The lower court record contains portions of the deposition testimony of four eyewitnesses to the incident. Ralph Skidmore (Ralph), James Beam, and Don Stutzman viewed the events from outside Cooper's house, and Cooper viewed the events from inside his

house. Each eyewitness testified that the evening of July 19, 2011, was warm and calm and that shortly after dark they heard a loud boom, following which the street lights in the area went out. Beam, Stutzman, and Ralph all observed sparks and light at the red van in Cooper's driveway. Concerned that the van might explode or set fire to Cooper's house, Beam, Stutzman, and Cathy each went to Cooper's house to warn him.

### 1. JAMES BEAM'S TESTIMONY

Beam testified that after hearing the boom, he stepped out onto his porch, at which point "I seen [sic] the sparks on top of the van which was flashing light." Stutzman was next to him, and together they ran to Cooper's house "[t]o let them know that their van had sparks shooting off of it. It looked like it was going to catch on fire, maybe explode. It was just kind of a panicked instinct, I guess, to try to warn them to just get away from it."[1] He and Stutzman banged on the front door and front window and yelled to Cooper that there was a fire. While he was at the front of Cooper's house, Beam saw Cathy run across Winnifred Street going from her house to Cooper's side yard. As she entered Cooper's side yard, Beam yelled "[s]top," but Cathy did not turn in his direction, and he did not know if she heard him. He then heard a "loud pop," and "[s]he dropped to the ground and burst in[to] flames." Cathy's husband, Ralph, came running over with a fire extinguisher, which Stutzman took from him and used to try to put out the flames.

---

[1] When asked what he and Stutzman planned to do next if Cooper did not come to the door, Beam stated, "There was no planning. There was no thought. It was just a reaction to an emergency."

On cross-examination by plaintiff's counsel, Beam was asked whether he had seen the power line in the grass before Cathy came into contact with it. He testified as follows:

> *Q.* Now you talked to counsel about Mrs. Skidmore coming in contact with the wire . . . and things of that nature. Is it fair to say, Mr. Beam, that before she contacted the wire you didn't actually know it was even in the yard?

> \* \* \*

> *A.* Yes.

> *Q.* Was there any sparking that you saw at any point prior to the accident, any sparking on the grass?

> *A.* No.

> *Q.* Anything at all that would suggest to you visibly that a power line was laying in the grass?

> \* \* \*

> *A.* No.

### 2. DON STUTZMAN

Stutzman testified that he heard a loud pop and went outside with Beam to see what was going on. He testified that he could see sparks in two places, at the transformer at the top of the utility pole at Shirley and Winnifred and by Cooper's van in the driveway on Winnifred. Although he could not see the rest of the line, he concluded that it was somewhere along the side of Cooper's house. When he saw Cathy "fast walk[ing]" into the side yard, he yelled for her to stop, but could not tell if she heard him over the noise. He testified:

> *Q.* Did it look like she heard you?

> *A.* Can't tell.

*Q.* And so you saw Ms. Skidmore come in contact with the wire?

*A.* Not visually seen it, but she was there one minute and gone the next.

*Q.* So you saw her walking across the yard and then just fall.

*A.* Correct.

*Q.* And you're assuming that's because she touched the wire?

*A.* Yes.

Stutzman also testified that until Cathy went down and caught fire, there had been no fire in the yard and that the area had been dark. When asked to further describe the visibility of the wire, he stated that it was dark and that the line was "black-grey." He stated that "you can barely pick out most of [the] lines. So if it's dark outside and you can't see anything, it's kinda hard to see a black line." He explained:

*Q.* Was there any sparking or lighting in the proximity of the line on the grass before that incident?

*A.* Not that I could see.

*Q.* Was there anything at all visually that would tell somebody running by there that there was a power line in the grass at that time?

\* \* \*

*A.* No.

After Cathy fell to the ground and caught fire, Ralph approached with a fire extinguisher. Stutzman took it from him, went to Cathy, and sprayed her with it.

### 3. RODDY COOPER

According to Cooper, the power line that broke runs above the southeastern corner of his house. Cooper

heard a loud boom, followed by a brilliant flash and a buzzing sound. He looked out his back door and saw flames and a wire on the ground next to his van, and he saw the wire sliding toward a bush. He realized a power line had come down, so he called 911. While he was speaking with the 911 operator, he heard several people (apparently Beam and Stutzman) knocking at his front door. He heard various people yelling "fire." He stood at his dining room window, which is about halfway along the side of the house. He could see across the street to the Skidmore house. He saw Cathy, who lived across the street, come out onto her side porch and call out, "Oh, my God, there's a fire. Ralph, Ralph." As he looked from the dining room window to the rear of the house (his left as he stood looking out the dining room window), he saw sparks and flames by the van. To his right, along the side yard, there were no flames or sparks. Nor were there any by the kitchen windows that were between the dining room and the driveway.

Cooper was asked whether there was any reason that Cathy would have had trouble "see[ing] a power line down when she ran across from her house to go warn you at your house[.]" He answered that "it was dark out in the yard. I didn't even see the line. I couldn't see the line, and I was right there." He stated that the line was sparking and arcing by the back door next to the van, "but out in the yard or wherever it was it came from, I couldn't see where it was going from there. . . . The only lights that I could see out there was street lights and window lights in the distance but everything in between was black. I mean I saw a silhouette. Even after Cathy was down, I saw a silhouette of people out in the road and they were just dark shadows. They were dark shadows. It was dark out there."

### 4. RALPH SKIDMORE

Ralph testified that as he was getting into bed that evening at about 10:00 p.m., the lights flickered briefly. A few minutes later, Cathy, who was in the front room of the house where the window provided a view of Cooper's house across the street, called out that Cooper's van was on fire and that she was afraid it would explode. Ralph came to the front room, looked out the window with Cathy, and saw that "the van was on fire. You could see glowing and everything." They saw "sparks" and "bright flashes of light" on the side of the van facing toward the rear of the Cooper house. He heard sounds that "sounded like somebody was welding." Ralph stated, "I thought the van was on fire. I'm not sure exactly what was making all the sparks and the smoke and everything. . . . In my mind, there was something going on with the power lines." He agreed that he thought a power line had likely fallen.

According to Ralph, Cathy made no statements to him other than that she thought the van was on fire and that they needed to get Cooper out of his house. She said she thought the van might explode, and she ran out of the house to warn him. Ralph followed her outside and saw her run towards Cooper's dining room windows, inside of which he could see Cooper standing. He then saw her fall and catch fire.

Cathy died from her injuries.

### B. TESTIMONY CONCERNING DEFENDANT'S ALLEGED FAILURE TO SECURE AND MAINTAIN ITS ELEVATED POWER LINE

According to Ralph, the power lines in the neighborhood had been a problem for about 25 years, and the power would go out two or three times each summer. Stutzman and Beam also testified about frequent

power outages and electrical problems. Ralph testified that following a windstorm in May 2011, Consumers worked on the lines, but neighbors complained about the power lines being too tight, including the line that broke on the night of the accident. Beam testified that the line in question had been suspended from a short pole anchored to the remaining portion of the original pole that had broken during the May storm.

Ralph testified that a power line had also fallen one year before the accident, and Cooper testified that the subject incident was the second consecutive summer that a high-voltage line had fallen in his yard. Cooper testified that he told the workers that the trees needed to be trimmed and that neighbors had complained about the trees causing arcing and sparking during wind and rain. James Leahy, a journeyman line worker, testified that if a tree touches a line and causes a repeated arc, the power line may fall. However, other deponents testified that there are many reasons why a power line could fall, including the activities of weather and animals.

Dr. Campbell Laird, one of the estate's experts, opined that Consumers lacked a "systematic inspection system" for the maintenance of vegetation surrounding power lines. Laird averred that a properly maintained power line should not fall absent some trauma to the line. Richard L. Buchanan, a public-utility expert, opined that Cathy's death was caused by poor vegetation management. Buchanan further opined that the same power line that had fallen on the night of July 19, 2011, had also fallen in July 2010. Therefore, Buchanan asserted that the 2010 incident with the power line should have alerted Consumers about the condition of the power lines in Cathy's neighborhood. Buchanan concluded that Consumers violated industry

standards by failing to conduct preventative vegetation trimming.

## II. STANDARD OF REVIEW

This Court reviews de novo the trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When a party moves for summary disposition under MCR 2.116(C)(8) and (10), and the trial court considers documents outside the pleadings when deciding the motion, we review the trial court's decision under MCR 2.116(C)(10). *Hughes v Region VII Area Agency on Aging*, 277 Mich App 268, 273; 744 NW2d 10 (2007). A party is entitled to summary disposition under MCR 2.116(C)(10) if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (citation and quotation marks omitted). A genuine issue of material fact exists if, when viewing the record in the light most favorable to the nonmoving party, reasonable minds could differ on the issue. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 116; 839 NW2d 223 (2013). Whether a defendant owed a plaintiff a duty is a question of law that this Court reviews de novo. *In re Certified Question from the Fourteenth Dist Court of Appeals of Texas*, 479 Mich 498, 504; 740 NW2d 206 (2007).

## III. DUTY

To prove negligence, a plaintiff must show that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the defendant's breach caused the plaintiff's injury. *Henry v Dow Chemical Co*, 473 Mich 63, 71-72; 701 NW2d 684 (2005). "Every person engaged in the performance of an undertaking has a duty

to use due care or to not unreasonably endanger the person or property of others." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). But if it is not foreseeable that the defendant's conduct could pose a risk of injury to a person with whom the defendant has a relationship, then there is no duty not to engage in that conduct. *Certified Question*, 479 Mich at 508.

The extent of duty that an electric utility company owes the public has been a topic of this state's jurisprudence for over a century. See *Huber v Twin City Gen Electric Co*, 168 Mich 531; 134 NW 980 (1912); *Laney v Consumers Power Co*, 418 Mich 180; 341 NW2d 106 (1983).

The issue was extensively explored in *Schultz v Consumers Power Co*, 443 Mich 445; 506 NW2d 175 (1993). In *Schultz*, the plaintiff's decedent was electrocuted while helping a friend paint his house. *Id.* at 447. The plaintiff's decedent was moving a 27-foot aluminum extension ladder and was electrocuted even though the ladder never touched the elevated wires. *Id.* at 447-448. The plaintiff alleged that a fray in the wire, which resulted from inadequate maintenance, allowed the electrical current to arc, i.e., jump through the air, to the nearby ladder. *Id.* at 448-449.

Our Supreme Court held that "a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id.* at 451. This duty "involve[s] more than merely remedying defective conditions actually brought to its attention." *Id.* at 454.[2] It

---

[2] In *Case v Consumers Power Co*, 463 Mich 1, 7-8, 8 n 8; 615 NW2d 17 (2000), the Supreme Court clarified that a utility's general duty is always one of reasonable care, but that when the risk "involve[s] the dangers of unintended contact with high-voltage electricity," the "spe-

is not a leap to conclude that this duty includes an obligation to reasonably inspect for fraying lines, as is alleged here, because a frayed line was responsible for the injury in *Schultz*.

This duty does not, however, include guarding or warning against every possible contact with elevated power lines. In Chief Justice BRICKLEY's lead opinion resolving the consolidated cases in *Groncki v Detroit Edison Co*, 453 Mich 644, 657, 660; 557 NW2d 289 (1996) (opinion by BRICKLEY, C.J.), the Supreme Court rejected several claims involving incidents in which individuals accidentally came in direct contact with power lines that were elevated and that were not alleged to be defective or improperly maintained. The Court held that the defendant could not have foreseen that equipment would come into contact with its reasonably maintained elevated powerlines. *Id*. Similarly, in *Valcaniant v Detroit Edison Co*, 470 Mich 82, 84-85; 679 NW2d 689 (2004), the Supreme Court rejected a case in which the plaintiff was shocked when the highest edge of a dump truck severed the overhead power lines. Again, the Court explicitly noted that there were no allegations that the lines were not properly inspected and maintained. *Id*. at 86.

Consumers contends that this case is on all fours with *Groncki* and *Valcaniant*. We disagree. Both cases are plainly distinguishable. First, in *Groncki* and *Valcaniant*, the Court specifically noted that the defendant's duty to maintain the lines in reasonable condi-

cific standard of care required in order to avoid breaching the general standard" includes "an obligation to reasonably inspect and repair wires." When the danger is of a different magnitude, as in *Case*, in which the danger was merely of "stray voltage" affecting the milk production of dairy cows, the Court held that only the general duty instruction should be given and that it is for the jury to determine what precise actions are required to meet the duty of reasonable care. *Id*. at 9-11.

tion was *not* at issue. By contrast, in this case the state of repair of Consumers' lines is directly at issue.[3] Second, the allegation in this case is not that Consumers should have foreseen accidental contact with an *elevated* power line; it is that Consumers should have foreseen accidental contact with a *power line that fell to the ground*. The risks of accidental contact with a live power line suspended in the air and accidental contact with a live power line on the ground are fundamentally different.[4]

Consumers argues that the unforeseeability of contact with a properly elevated power line necessitates a finding that contact with a power line that has fallen to the ground is also unforeseeable. However, this case bears no resemblance to the cases cited by defendant in which a person using a large ladder or piece of industrial equipment made contact with a properly maintained *elevated* power line well out of the reach of individuals passing by. Rather, this case involves the question of whether Consumers breached its duty to reasonably maintain its power lines and that as a result of that breach, a line fell to the ground, thereby creating a new and distinct potential for electrocution.

Moreover, it is reasonably foreseeable that persons in a residential area would act in response to the emergency to aid a neighbor. Indeed, both Beam and Stutzman also attempted to rescue Cooper. "[R]escu-

---

[3] Plaintiff has not alleged that the lines should not have been placed where they were or that they should have been placed at a higher elevation, only that they should have been maintained so as not to fall to the ground on a calm day.

[4] As stated by Chief Judge Cardozo of the New York Court of Appeals in an axiom familiar to any first-year law student, "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Palsgraf v Long Island R Co*, 248 NY 339, 344; 162 NE 99 (1928).

ers, as a class, are foreseeable." *Solomon v Shuell*, 435
Mich 104, 135; 457 NW2d 669 (1990) (opinion by
ARCHER, J.).

> If the rescue attempt itself is reasonable, then the rescuer
> is not deemed *comparatively* negligent merely for volun-
> tarily exposing himself to an increased risk of harm in
> order to save another. The second step of the analysis is to
> determine whether the rescuer carried out the rescue
> attempt in a reasonable manner. If the rescuer did not,
> then the rescuer's recovery is reduced by his comparative
> degree of fault. [*Id.* at 136.][5]

While rescuers must act reasonably, whether they did
so is a question of fact, not a question of law. *Id.* at
135-136.[6]

Defendant nevertheless argues that this case had to
be dismissed because Cathy failed to take reasonable
care to avoid the wire that had fallen in Cooper's yard.
Even putting aside the rescue doctrine, we reject this
argument on both factual and legal grounds.

We reject defendant's argument factually because
defendant may not simply wish away the many ques-
tions of fact that are present in this case. Whether
Cathy even understood that a power line had fallen

---

[5] Two other Justices concurred in Justice ARCHER's opinion in full.
Justice BOYLE wrote a separate concurrence signed by two other Justices
in which she agreed that "the rescue doctrine provides that a rescuer is
not deemed comparatively negligent merely for exposing himself to an
increased risk of harm in order to save another so long as 1) it is not
unreasonable to undertake the rescue, and 2) the rescue is carried out in
a reasonable manner." *Id.* at 151 (BOYLE, J., concurring). The seventh
Justice did not disagree, but concluded that an erroneous jury instruc-
tion regarding the rescue doctrine was harmless. *Id.* at 153-154 (GRIFFIN,
J., dissenting).

[6] That the reasonableness of a rescue is a question of fact holds true to
the general principle that a plaintiff's comparative negligence does not
alter the nature of the defendant's initial duty. See *Riddle v McLouth
Steel Prods Corp*, 440 Mich 85, 98; 485 NW2d 676 (1992).

anywhere on Cooper's property is a question of fact. She presumably saw what her husband saw when looking out the window, which supports the view that she saw that a line was down. However, Ralph testified that the only statement his wife made was that the "neighbor's van is on fire," and Cooper testified that Cathy called out to him that there was a "fire." She made no statement about a downed power line to anyone. In addition, no one testified that they called out to her that a live power line had fallen. Moreover, even if she was aware that a line had fallen on the van, there is no evidence that she saw the power line in the yard, let alone in her path. The eyewitnesses all agreed that the only place the line could be seen was at Cooper's van, a significant distance from the dining room window that she was approaching. They unanimously testified that it was very dark, that there was no sparking or fire in the area where Cathy was walking, and that they had been unable to see the downed line in the grass where Cathy was electrocuted or even anywhere in the yard until the glow and fire of her electrocution lit the area.

We also reject the argument legally because Consumers is essentially claiming that this case should be treated as a premises liability case and that the fallen power line was an open and obvious hazard. However, the open-and-obvious-danger doctrine has no applicability to this case. It is axiomatic that only a party that owns or controls the subject property may assert that its duty was limited by the open-and-obvious-danger doctrine. Had the estate sued the owner of the subject property, the owner could properly argue that his duty is limited to dangers that are not open and obvious and do not "give rise to a uniquely high likelihood of harm or severity of harm if the risk is not avoided." *Lugo v Ameritech Corp, Inc*, 464 Mich 512, 518-519; 629 NW2d

384 (2001). However, Consumers had neither owner-
ship nor control of the property its power line fell onto,
and Consumers may not assert the legal privileges of
that owner. The mere fact that the injury occurred on a
third party's premises does not transform a case about
proper maintenance of elevated high-voltage power
lines into a premises liability case.

We reverse and remand for further proceedings
consistent with this opinion.[7] We do not retain juris-
diction. As the prevailing party, the estate may tax
costs. MCR 7.219.

BORRELLO, J., concurred with SHAPIRO, P.J.

O'CONNELL, J. (*concurring in part and dissenting in
part*). The adage "be careful what you wish for" comes
to mind. In asking this Court to clarify our previous
opinion on the basis of concerns of what Consumers
might argue based on overblown and distorted read-
ings of this Court's prior opinion,[1] the estate opens a
can of worms. The opinion on remand does not "correct"
what either party contends are deficiencies with the
previous opinion, but instead raises premises liability
issues that were not raised or briefed below and are
frankly irrelevant in this general negligence case.

---

[7] To the extent that Consumers raises causation issues on appeal,
Consumers did not raise these issues below. "[A]n appellee need not file
a cross-appeal to argue alternative reasons" to affirm, but the appellee
must have presented the reasons to the trial court. *Riverview v Sibley
Limestone*, 270 Mich App 627, 633 n 4; 716 NW2d 615 (2006). We decline
to address these unpreserved issues because they do not concern issues
of law, they are not necessary to the resolution of the remaining issues,
and our failure to rule on them will not work a manifest injustice. See
*Heydon v MediaOne of Southeast Mich, Inc*, 275 Mich App 267, 278; 739
NW2d 373 (2007).

[1] Consumers, meanwhile, essentially restates the same arguments
this Court previously rejected.

Rather than clarify or reach a different result than the previous opinion, the opinion on reconsideration simply confuses the issues more. I would therefore not grant reconsideration, and I remain with the analysis in the original opinion, which I restate here for convenience:

> A live power line on the ground is far more hazardous than a live power line in the air. In this wrongful death action, plaintiff Ralph Skidmore, Jr., individually and as the personal representative of the estate of Catherine Dawn Skidmore (collectively, the estate), appeals of right the trial court's order granting summary disposition in favor of defendant, Consumers Energy Company (Consumers), under MCR 2.116(C)(10). The trial court concluded that Consumers did not owe Catherine a duty because it was not foreseeable that she would run across her neighbor's darkened yard to warn him of a fire that resulted from a downed power line. We reverse and remand.

### I. FACTUAL BACKGROUND

> According to Ralph, the evening of July 19, 2011, was warm and clear. As Ralph was getting into bed that evening, the lights flickered and Catherine began screaming that a neighbor's van was on fire. Ralph looked out a window and saw sparks and fire coming from the van across the street. He could see that a power line had fallen on top of the van, and he explained that he could only see movement and light because it had fallen on the opposite side of the van.

> Ralph testified that Catherine thought that the van might explode and was frantic with concern for the man who lived in the house across the street. Catherine "bolted out of the house" to warn the neighbor, Roddy Cooper. Ralph testified that Catherine ran for the window where the neighbor Cooper was standing. Ralph heard people yell for her to stop, but he opined that she likely did not hear them over the loud crackling of the electricity.

According to Cooper, the power line that broke runs above the southeastern corner of his house. Cooper heard a loud boom, followed by a brilliant flash and a buzzing sound. He looked outside and saw flashing sparks in a bush, so he called 911. The line was sliding "like it was pulling itself through the bush." Cooper saw Catherine on the porch on the northwestern corner of his home. She yelled to him that there was a fire, and he shouted back that he heard. As he was traveling to the other end of his house, he heard a sharp crack and a lot of yelling.

Cooper, Don Stutzman, and James Beam testified that Cooper's yard was dark. Stutzman and Beam testified that they could not see where the line was in the yard. They yelled at Catherine to stop but could not tell if she heard them. Ralph saw a wire twist around Catherine's legs. Catherine began shaking and then caught on fire. Despite efforts to put Catherine out with a fire extinguisher, she repeatedly lit on fire and died.

According to Ralph, the power lines in the neighborhood had been a problem for about 25 years, and the power would go off two or three times each summer. Stutzman and Beam also testified about frequent power outages and electrical problems. Ralph testified that following a windstorm in May 2011, Consumers worked on the lines, but neighbors complained about the power lines being too tight, including the line that broke on the night of the accident. Beam testified that the power line that broke was a short pole anchored to a pole that had been broken.

Ralph testified that a power line had also fallen one year before the accident, and Cooper testified that the incident in 2011 was the second consecutive summer that a high-voltage line had fallen in his yard. Cooper testified that he had told the workers that the trees needed to be trimmed and that neighbors had complained about the trees causing arcing and sparking during wind and rain. James Leahy, a journeyman line worker, testified that if a tree touches a line and causes a repeated arc, the power line may fall. However, other deponents testified that there are many reasons why a power line could fall, including the activities of weather and animals.

Dr. Campbell Laird, one of the estate's experts, opined that Consumers lacked a "systematic inspection system" for the maintenance of vegetation surrounding power lines. Laird averred that a properly maintained power line should not fall absent some trauma to the line. Richard L. Buchanan, a public-utility expert, opined that Catherine's death was caused by poor vegetation management. Buchanan asserted that the 2010 incident with the power line should have warned Consumers about the power lines in Catherine's neighborhood. Buchanan concluded that Consumers violated industry standards by failing to conduct preventative vegetation trimming.

The estate filed suit in May 2012. The estate asserted claims of negligence and negligent infliction of emotional distress, based, in pertinent part, on Consumers' duty to reasonably inspect and maintain its power lines. In July 2014, Consumers filed a motion for summary disposition, asserting that it was not reasonably foreseeable that Catherine would run into the downed power line. Following a hearing on the motion, the trial court concluded that Catherine's actions were not reasonable and, therefore, that Consumers did not owe Catherine a duty. It granted summary disposition. The estate now appeals.

## II. STANDARDS OF REVIEW

This Court reviews de novo the trial court's decision on a motion for summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When a party moves for summary disposition under MCR 2.116(C)(8) and (10), and the trial court considered documents outside the pleadings when deciding the motion, we review the trial court's decision under MCR 2.116(C)(10). *Hughes v Region VII Area Agency on Aging*, 277 Mich App 268, 273; 744 NW2d 10 (2007).

A party is entitled to summary disposition under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." A genuine issue of material fact exists if, when viewing the record in the light most favorable to

the nonmoving party, reasonable minds could differ on the issue. *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 116; 839 NW2d 223 (2013). Whether a defendant owed a plaintiff a duty is a question of law that this Court reviews de novo. *In re Certified Question from the Fourteenth Dist Court of Appeals of Texas*, 479 Mich 498, 504; 740 NW2d 206 (2007).

### III. DUTY

The estate contends that the trial court improperly conflated questions concerning whether Consumers owed Catherine a duty, a question of law, with comparative negligence, which is a question of fact for a jury to decide. We disagree, but we conclude that a question of fact precludes summary disposition.

To prove negligence, a plaintiff must show that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the defendant's breach caused the plaintiff's injury. *Henry v Dow Chem Co*, 473 Mich 63, 71-72; 701 NW2d 684 (2005). "Every person engaged in the performance of an undertaking has a duty to use due care or to not unreasonably endanger the person or property of others." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). But if it is not foreseeable that the defendant's conduct could pose a risk of injury to a person with whom the defendant has a relationship, then there is no duty not to engage in that conduct. *Certified Question*, 479 Mich at 508.

The extent of duty that an electric utility company owes the public has been a topic of this state's jurisprudence for over a century. See, e.g., *Huber v Twin City Gen Electric Co*, 168 Mich 531, 535; 134 NW 980 (1912). More recently, the Michigan Supreme Court has applied modern tort principles to explain an electrical utility company's duty to the general public. *Schultz v Consumers Power Co*, 443 Mich 445, 450; 506 NW2d 175 (1993).

In *Schultz*, the plaintiff's decedent was electrocuted while helping a friend paint his house. *Id.* at 447. While

moving a 27-foot aluminum extension ladder, the defendant's medium-voltage electrical wires electrocuted the decedent. *Id*. at 447-448. The plaintiff alleged that a fray in the wire allowed the electrical current to arc to the nearby ladder. *Id*. at 448-449.

The Court held that "a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id*. at 451. This duty "involve[s] more than merely remedying defective conditions actually brought to its attention." *Id*. at 454. The Court reasoned that "it is well settled that electricity possesses inherently dangerous properties requiring expertise in dealing with its phenomena." *Id*. at 451.

However, this duty does not include guarding against every possible contact with the power lines. In Chief Justice BRICKLEY's lead opinion resolving the consolidated cases in *Groncki v Detroit Edison Co*, 453 Mich 644; 557 NW2d 289 (1996),[1] the Michigan Supreme Court rejected several claims involving accidental contacts with overhead wires. The Court explicitly recognized that the cases did not involve allegations of poorly maintained wires. *Id*. at 657, 660. Rather, in the specific circumstances of the cases, the defendant had no reason to foresee that equipment would come into contact with its reasonably placed power lines. *Id*. at 657, 660. And in *Valcaniant*, the Michigan Supreme Court rejected a case in which a dump truck's driver was shocked after accidentally severing overhead power lines. *Valcaniant v Detroit Edison Co*, 470 Mich 82, 84-85; 679 NW2d 689 (2004). Again, the Court explicitly noted that the lines' state of repair was not pertinent to its holding, and the holding did not implicate the defendant's duty to inspect its lines. *Id*. at 86.

Consumers contends that it had no more duty in this case than the defendants had in *Groncki* and *Valcaniant*. We disagree.

First, each of these cases is distinguishable because the Court specifically noted that the state of repair of the

lines was not at issue. In this case, the state of repair of Consumers' lines is directly at issue. Second, Consumers fails to comprehend that the risks of accidental contact with a live power line suspended in the air and accidental contact with a live power line on the ground are fundamentally different. As stated by Chief Judge Cardozo of the New York Court of Appeals in an axiom familiar to any first-year torts student, "The risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Palsgraf v Long Island R Co*, 248 NY 339, 344; 162 NE 99 (1928). If nothing else, people are more likely to be in close proximity to a power line on the ground than they are likely to be if the power line is suspended in the air.

The question is whether it is reasonably foreseeable that failing to reasonably inspect and maintain power lines would result in a dangerous situation to a person on the ground. *Schultz* answers this question in the positive, providing that "a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Schultz*, 443 Mich at 451. It is not a leap to conclude that this duty includes an obligation to reasonably inspect for fraying lines because a frayed line was responsible for the injury in *Schultz*. An injury due to a live power line on the ground is far more foreseeable than an injury due to a power line in the air.

Consumers contends that it could not have expected that Catherine would run toward, rather than away from, the power line. However, that argument focuses too closely on the particular act that resulted in injury. The *Schultz* Court explained that the foreseeability of an injury depends, in part, on the expected uses of an area:

> Those engaged in transmitting electricity are bound to anticipate ordinary use of the area surrounding the lines and to appropriately safeguard the attendant risks. *The test to determine whether a duty was owed is not whether the company should*

> *have anticipated the particular act from which the*
> *injury resulted,* but whether it should have foreseen
> the probability that injury might result from any
> reasonable activity done on the premises for busi-
> ness, work, or pleasure. [*Id.* at 452 (emphasis
> added).]

The area surrounding the power line was residential. It is foreseeable that people would be using the surrounding streets and yards and would be at risk if the power line fell. We conclude that it was reasonably foreseeable that an injury could follow from failing to inspect and maintain a power line in a residential area.

Additionally, it is reasonably foreseeable that those persons in the residential area would act in response to the emergency. "[R]escuers, as a class, are foresee-able . . . ." *Solomon v Shuell,* 435 Mich 104, 135; 457 NW2d 669 (1990) (opinion by ARCHER, J.); *id.* at 151 (opinion by BOYLE, J.). Rescuers must act reasonably. *Id.* at 135 (opinion by ARCHER, J.). But whether the rescuer acted reasonably is a question of fact, not a question of law. *Id.* at 136.[2]

We conclude that there is an issue of material fact regarding whether Catherine acted reasonably. Ralph testified that he and Catherine both were aware that a power line had fallen. However, Ralph also testified that Catherine was frantic, concerned for her neighbor, and went to his home to warn him of the danger. Cooper testified that Catherine approached his southwestern door, away from obvious sparks and fire around the van at the house's southeastern corner. On the other hand, with the knowledge that there was a downed power line nearby, Catherine also ran across a darkened yard while people were yelling for her to stop. Even the trial court stated that whether Catherine's actions were reasonable consti-tuted a close question. We conclude that reasonable minds could differ on this issue. Accordingly, the trial court erred when it granted summary disposition on the estate's claims on the basis that Consumers did not owe Catherine a duty.[3]

¹ The *Groncki* Court was fractured regarding its ratio-
nale. See *Valcaniant v Detroit Edison Co*, 470 Mich 82, 87
n 7; 679 NW2d 689 (2004) (providing an overview of the
Justices' positions in *Groncki*).

² That the reasonableness of a rescue is a question of
fact holds true to the general principle that the fact that a
plaintiff was also negligent does not alter the nature of the
defendant's initial duty. *Riddle v McLouth Steel Prod
Corp*, 440 Mich 85, 98; 485 NW2d 676 (1992).

³ To the extent that Consumers raises causation issues
on appeal, Consumers did not raise these issues in the
trial court. An appellee need not file a cross-appeal to
argue alternative reasons to affirm, but the appellee must
have presented the reasons to the trial court. *Riverview v
Sibley Limestone*, 270 Mich App 627, 633 n 4; 716 NW2d
615 (2006). We decline to address these unpreserved
issues because they do not concern issues of law, they are
not necessary to the resolution of the remaining issues,
and our failure to rule on them will not work a manifest
injustice. See *Heydon v MediaOne of Southeast Mich, Inc*,
275 Mich App 267, 278; 739 NW2d 373 (2007).

In sum, I concur in the result reached and the reason-
ing regarding duty in the opinion on reconsideration,
but dissent from that portion of the majority opinion
rejecting "on both factual and legal grounds" Consum-
ers' arguments. Our prior opinion recognized that the
existence of a disputed question of fact regarding the
reasonableness of Catherine's actions did not affect
whether Consumers owed Catherine a duty (indeed,
regardless of the estate's stated confusion on the issue,
it is hard to imagine that this Court could have been
more clear than stating in the second footnote that the
fact the plaintiff was also negligent did not alter the
nature of the defendant's initial duty). And the discus-
sion of premises liability, an issue neither raised below

nor argued by the parties on appeal *or reconsideration*, is unnecessary. The only question was whether the trial court properly granted summary disposition on the basis that Catherine did not act reasonably and, therefore, Consumers did not owe her a duty. I stand by this Court's initial analysis.